**07 CV 3559**

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
By: BARBARA A. WARD
Assistant United States Attorney
One Saint Andrew's Plaza
New York, New York 10007
Tel. 212-637-1048

JUDGE PRESKA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                        :

                          Plaintiff,             :        VERIFIED COMPLAINT

                  - v -                          :        07 Civ.

APPROXIMATELY $84 MILLION ON                     :
DEPOSIT IN ACCOUNT NO. ■■4025 IN THE
NAME OF THE TREASURY OF THE                      :
MINISTRY OF FINANCE OF THE REPUBLIC
OF KAZAKHSTAN AT PICTET & CIE,                   :
GENEVA, SWITZERLAND, FORMERLY ON
DEPOSIT IN ACCOUNT NO. ■■789E AT                 :
CAI INDOSUEZ, GENEVA, SWITZERLAND,
AND ALL INTEREST, INCOME, BENEFITS,              :
AND OTHER PROCEEDS TRACEABLE
THERETO,                                         :

                  Defendant in rem.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff United States of America, by its attorney, Michael J. Garcia, United States

Attorney for the Southern District of New York, for its verified complaint alleges, upon

information and belief, as follows:

## I. NATURE OF THE ACTION

1. This is an action by the United States of America seeking forfeiture of approximately $84 million on deposit in Account No. ▉▉4025 in the Name of the Treasury of the Ministry of Finance of the Republic of Kazakhstan at Pictet & Cie, Geneva, Switzerland, formerly on deposit in Account No. ▉▉789E in the name of Orel Capital Ltd. at Credit Agricole Indosuez, Geneva, Switzerland, and all interest, income, benefits, and other property traceable thereto (hereinafter referred to as the "Defendant Funds"). Forfeiture is sought pursuant to 18 U.S.C. §§ 981(a)(1)(C) on the ground that the Defendant Funds constitute or are derived from proceeds traceable to unlawful bribery and fraud payments to the President of Kazakhstan, and proceeds traceable to wire fraud, and property traceable to such property. Forfeiture is also sought pursuant to 18 U.S.C. § 981(a)(1)(A) on the ground that the Defendant Funds are property involved in money laundering transactions in violation of 18 U.S.C. §§ 1956(a)(2)(A), 1956(a)(1)(B)(i), 1956(h) and 1957, and property traceable to such property.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

3. Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

## III. PROBABLE CAUSE FOR FORFEITURE

### Overview

4. On April 2, 2003, a federal grand jury in the Southern District of New York returned Indictment 03 Cr. 404 charging defendant James H. Giffen with, *inter alia*, violation of the Foreign Corrupt Practices Act ("FCPA"), in violation of 15 U.S.C. § 78dd-2; wire fraud, in

2

violation of 18 U.S.C. § 1343; and money laundering, in violation of 18 U.S.C. §§ 1956 and 1957. Superseding Indictment S2 03 Cr. 404 (WHP) was returned on August 4, 2004 (the "Indictment"). A copy of the Indictment is attached hereto as Exhibit A and incorporated herein by reference as if set out in full.[1]

5.      The Indictment alleges, in summary, that, between 1995 and 1999, Giffen made unlawful payments to three senior Kazakh officials to obtain and retain business for his New York-based company, Mercator Corporation ("Mercator"). The Kazakh official were referred to in the Indictment as "KO-1," "KO-2" and "KO-3" (referred to collectively hereinafter as the "senior Kazakh officials"). KO-1 and KO-2 were subsequently identified in a Court document as Nurlan Balgimbaev, the former Prime Minister and Oil Minister, and Nursultan Nazarbaev, the former and current President, respectively. Giffen was Mercator's principal shareholder, board chairman and chief executive officer. (Ind. ¶¶ 2-6).

6.      Kazakhstan, formerly a Republic within the Soviet Union, has been a sovereign nation since 1991. Kazakhstan has substantial deposits of oil and gas within its territory which, under the Kazakhstan constitution, are government property. Since declaring its independence, Kazakhstan has sold the rights to portions of its oil and gas wealth to various international oil companies, including American oil companies. (Ind. ¶ 1).

7.      Mercator advised Kazakhstan in connection with various transactions related to the sale by Kazakhstan of portions of its oil and gas wealth. (Ind. ¶ 2). On or about December 31, 1994, Mercator entered into an agreement with the Kazakh Ministry of Oil and Gas Industries to

---

[1]      The Indictment included a criminal forfeiture allegation charging that Giffen should forfeit to the United States pursuant to 18 U.S.C. § 982 all property, real and personal, involved in the money laundering offenses and all property traceable to such property.

entitled from oil transactions, and defrauded the people of Kazakhstan of the right to the honest services of their elected and appointed officials.

## Statutory Allegations

7.    From in or about 1995, up to and including in or about 2000, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, violations of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Sections 1341 and 1343.

8.    From in or about 1995, up to and including November 10, 1998, it was a part and an object of the conspiracy that JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, being American citizens and "domestic concerns" as that term is defined in the Foreign Corrupt Practices Act, would and did make use of the mails and any means and instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of anything of value to foreign officials for purposes of (a) influencing acts and decisions of such foreign official in their official

4

Balgimbaev (Ind. ¶ 63); and (v) causing Mercator to purchase in the United States and ship to Kazakhstan two snowmobiles for delivery to Nazarbaev and his wife (Ind. ¶ 64).

11.     Balgimbaev, Nazarbaev and KO-3 had the power to substantially influence whether Giffen and Mercator obtained and retained lucrative business as advisors and counselors to the government of Kazakhstan.  The unlawful payments Giffen made to the officials ensured that Giffen and Mercator obtained and retained such business, and that they remained in a position from which they could divert large sums from oil transactions into accounts for the benefit of the senior Kazakh officials and Giffen personally.  (Ind. ¶¶ 6, 65).

<u>The Tengiz Oil Field Transaction</u>

12.     In 1994, Kazakhstan retained Giffen and Mercator to assist in, among other things, the sale of a portion of Kazakhstan's interest in the Tengiz oil field.  Negotiations were commenced with Mobil Oil Corporation ("Mobil"), and, in or about July 1995, Mobil acquired the right to negotiate with the Kazakh Oil Ministry towards a purchase of a share in the Tengiz field. (Ind. ¶¶ 12-14).

13.     As part of the agreements between Kazakhstan and Mobil, Mobil agreed to assume responsibility for Kazakhstan's obligation to pay 5% of the purchase price to Mercator as Mercator's fee for consulting services.  Accordingly, on or about August 3, 1995, Mobil wired $5 million to Mercator's account at Citibank in New York, New York, and an additional $5 million on October 20, 1995, with the balance due at closing.  (Ind. ¶¶ 15-16).

14.     On or about May 3, 1996, Mobil closed its purchase from Kazakhstan of a 25% interest in the Tengiz oil field for approximately $1.05 billion.  Under the original agreement, Mercator's consulting fee was to have been included within the agreed upon purchase price.

However, at the request of Kazakhstan, Mobil ultimately agreed to pay the fee Kazakhstan owed

Mercator in addition to the agreed upon purchase price of $1.05 billion. (Ind. ¶ 17).

15.    On May 17, 1996, Mobil wired the balance of Mercator's fee, $41 million, to

Mercator's account at Citibank in New York, New York. (Ind. ¶ 17).

16.    In connection with the Tengiz transaction, Giffen and others caused at least $22

million to be secretly paid to Swiss bank accounts in the name of offshore companies secretly

controlled by senior Kazakh officials. (Ind. ¶ 18). Specifically:

a.    On or about November 6, 1995, Giffen caused Mercator to transfer

$5 million Mercator had received from Mobil in connection with the Tengiz deal to a Swiss

account in the name of Nichem Energy Ltd ("Nichem"), a company controlled by a co-conspirator.

(Ind. ¶ 19). Giffen and others then caused Nichem to transfer $1.8 million to Account No.

███789E in the name of Orel Capital Ltd. ("Orel") at Credit Agricole Indosuez ("CAI"), Geneva,

Switzerland (the "Orel Account"). (Ind. ¶ 20).

b.    The Orel Account was opened on or about September 12, 1995, shortly after

Mobil and Kazakhstan signed the first agreements in connection with the Tengiz oil field

transaction. Bank records identify the signatory on the account as SOGEA, an affiliate of CAI;

and the beneficial owner of Orel, a British Virgin Islands corporation, as the Semrek Foundation.

Organized under the laws of Liechtenstein, Semrek was secretly beneficially owned by Nazarbaev

and his heirs. (Ind. ¶ 20).

c.    Funds from the Orel account were used to pay more than $45,000 to an

exclusive Swiss high school attended by Nazarbaev's daughter. (Ind. ¶ 20).

6

      d.      On or about November 28, 1995, Giffen and others caused Nichem to wire $3.2 million to an account in Switzerland in the name of Hovelon Trading S.A. ("Hovelon"), a British Virgin Islands corporation secretly controlled by Giffen through a co-conspirator. Giffen and others then caused Hovelon to transfer $450,000 to a Swiss bank account in the name of Dundy Trading, Ltd., a British Virgin Islands company secretly owned by Balgimbaev. (Ind. ¶¶ 21-22).

      e.      After receipt of the $41 million payment from Mobil in connection with the Tengiz transaction on or about May 17, 1996, Giffen caused Mercator to make four separate wire transfers to Nichem totaling $20 million between August and November, 1996. (Ind. ¶ 23). During that period, Giffen and others caused Nichem to make four corresponding wire transfers, again totaling $20 million, to Giffen's secret Hovelon account in Switzerland. (Ind. ¶ 24). On February 6, 1997, $20.5 million was wired to Nazarbaev's Orel account from Hovelon's account. (Ind. ¶ 25).

The Caspian Pipeline Transaction

17.      In or about early 1997, the American oil company Amoco negotiated to acquire from the Kazakh Government an interest in the Caspian Pipeline Consortium ("CPC"), an entity building a substantial pipeline to facilitate international distribution of oil from Kazakhstan. (Ind. ¶ 30).

18.      In March 1997, Amoco entered into an escrow agreement with the Kazakh government and the Swiss branch of a French bank, Banque Indosuez. The agreement required Amoco to deposit more than $50 million into an escrow account at Banque Indosuez, which would

purportedly be disbursed to pay signature bonuses and consulting fees if the transaction closed. (Ind. ¶ 31).

19.    The escrow agreement specified that if the transaction closed, $50 million of the escrowed funds would be paid to an entity named TMG-CPC and that approximately $1.8 million would be paid to Mercator for its role in arranging the transaction. TMG-CPC was the legal entity through which the Kazakh government owned its interest in the CPC. Balgimbaev, in his official capacity, controlled TMG-CPC. (Ind. ¶ 31).

20.    On or about March 19, 1997, Amoco transferred more than $51 million from New York into the escrow account at Banque Indosuez. (Ind. ¶ 32).

21.    On or about May 16, 1997, Amoco advised Banque Indosuez that the transaction had closed and that the escrowed funds should be disbursed. Banque Indosuez thereafter transferred approximately $50 million to TMG-CPC and approximately $1.8 million to Mercator. (Ind. ¶ 33).

22.    TMG-CPC had, in or about March 1997, entered into a purported "call option" agreement with SOGEA, a Swiss corporation affiliated with Banque Indosuez. Under this sham agreement, SOGEA purportedly acquired for $500,000 an option to purchase for $5 million the right to receive a bonus equal to 71% of whatever TMG-CPC received from Amoco in the CPC transaction. (Ind. ¶ 34).

23.    Although not disclosed in the call option agreement, SOGEA, in entering into that agreement, was secretly acting on behalf of Tulerfield Investments, Inc. ("Tulerfield"), a British Virgin Islands company beneficially owned by Balgimbaev personally. SOGEA secretly agreed to

8

turn over to Tulerfield any bonus received from TMG-CPC under the call option agreement, less a $1 million fee for its services. (Ind. ¶ 35).

24.    On or about May 21, 1997, SOGEA purchased and exercised the call option, paying TMG-CPC a total of $5.5 million. TMG-CPC simultaneously transferred $35.5 million to SOGEA. SOGEA retained its $1 million fee and transferred the remaining funds – $34.5 million – to Tulerfield. Tulerfield transferred $5.5 million back to SOGEA to fund the purchase and exercise of the call option, resulting in a net deposit of $29 million to Balgimbaev's Tulerfield account. (Ind. ¶ 36).

25.    On or about May 22, 1997, Tulerfield transferred the entire net amount it had received - $29 million - to the Swiss bank account of Hovelon, secretly controlled by Giffen. (Ind. ¶ 37). From June to September 1997, Giffen caused Hovelon to transfer $12 million to Nazarbaev's Orel account (Ind. ¶ 38); $6 million to an account secretly benefitting KO-3 and his family (Ind. ¶ 39); $3 million to Balgimbaev's Orchard Holdings account (Ind. ¶ 40); and $5 million to a British Virgin Islands company owned by Balgimbaev's daughter, funds from which were used to pay bills for a credit card in her name (Ind. ¶ 41).

<u>The Karachaganak PSA Transaction</u>

26.    In or about November 1997, a group of international oil companies, including the American oil company Texaco, entered into a Production Sharing Agreement ("PSA") with Kazakhstan in connection with the Karachaganak oil and gas field. Under the agreement, the companies acquired certain rights to the oil and gas at Karachaganak and, as part of the transaction, the companies agreed to pay $17 million into an escrow account in Switzerland at CAI

9

(the successor to Banque Indosuez), purportedly for the purpose of paying the fees of certain advisers for Kazakhstan in connection with the transaction. (Ind. ¶¶ 5, 42).

27.    On or about November 11, 1997, the Kazakh government entered into an "Exclusive Paying Agency" agreement with CAI. Under the agreement, CAI agreed to accept the $17 million payment from the oil companies and to distribute it to specifically identified advisers of Kazakhstan, including Mercator, which received $4.75 million for its role in the deal. The agreement made it appear that CAI would receive an $11.44 million fee for providing financial advice to Kazakhstan in the transaction. (Ind. ¶ 43). In truth and in fact, almost 90% of CAI's purported fee was being paid to Giffen and, through Giffen, to Kazakh officials and Giffen himself. (Ind. ¶ 47).

28.    On or about January 26, 1998, the oil companies, including Texaco, transferred $17 million to CAI. CAI distributed the $17 million as specified in the Exclusive Paying Agency agreement, and, among other things, on or about January 30, 1998, transferred $11.44 million to an account at CAI in the name "Clients Divers Geneve" (the "Geneve account"), purportedly as CAI's fee. (Ind. ¶ 44).

29.    CAI entered into a secret, sham agreement, dated November 18, 1997, with Denlay Associates, Ltd., a British Virgin Islands Company secretly owned by Giffen (the "Denlay Agreement"). Under the Denlay Agreement, CAI agreed to pay to Denlay "finders & consulting fees" totaling $20,290,000, to the extent CAI received success fees from the Karachaganak PSA transaction, or from a second transaction related to offshore exploration in the Kazakh sector of the Caspian Sea. (Ind. ¶ 45).

30.     Upon receiving the $11.44 million, CAI on February 2, 1998 transferred $9.94 million from the Geneve account to Denlay's account, which Giffen had caused to be opened with a co-conspirator as signatory. (Ind. ¶ 46).  Shortly thereafter, Giffen caused over $9.5 million of these funds to be transferred out of the Denlay account:  $5 million was transferred to Nazarbaev's Orel account; $2.5 million was transferred to Balgimbaev's Orchard Holdings account; and $2.011 million was transferred to Condor Capital Management, a British Virgin Islands company owned by Giffen.  (Ind. ¶ 47).

The OKIOC Transaction

31.     In 1997 and 1998, a consortium of oil companies called the Caspian Offshore Consortium, including Mobil, negotiated to acquire from the Kazakh government the rights to participate in a joint venture known as the "Offshore Kazakhstan International Operating Company" ("OKIOC") to explore for oil in certain offshore blocks in the Kazakh sector of the Caspian Sea.  Giffen and Mercator were hired by the Kazakh government to assist in the negotiations. (Ind. ¶ 48).

32.     On or about November 18, 1997, the oil companies and Kazakhstan entered into a "Production Sharing Agreement" governing their participation in OKIOC's exploration.  Under the agreement, the oil companies agreed to pay the Kazakh government a $175 million "signature bonus" due shortly after the signing of the agreement.  Balgimbaev specified that the bonus should be divided amongst three bank accounts:  $100 million to an account at Credit Suisse in Switzerland, $52 million to an account at Pictet & Cie, in Switzerland, and $23 million to an account at CAI in Switzerland (the "CAI escrow account").  (Ind. ¶ 49).

33.     On or about November 1, 1997, Kazakhstan and CAI entered into an "Exclusive Paying Agency Agreement" to govern the CAI escrow account. The agreement specified that in exchange for a small fee, CAI would distribute the funds in the CAI escrow account to various consultants who had assisted Kazakhstan in the OKIOC transaction, including Mercator, which received $5.25 million, and CAI itself, which was purportedly to receive $11.85 million for providing financial and analytical services to Kazakhstan. (Ind. ¶ 50). In truth and in fact, as with the Karachaganak PSA Transaction, under the sham Denlay Agreement almost 90% of CAI's purported fee was being paid to Giffen and, through Giffen, to Kazakh officials and Giffen himself. (Ind. ¶ 52).

34.     Between on or about April 24 and 28, 1998, the oil companies participating in the consortium, including Mobil, caused a total of approximately $23 million to be wire transferred to the CAI escrow account. On or about April 28, 1998, $11,850,000 was transferred from the CAI escrow account to the Geneve account, purportedly as payment of CAI's fee. However, pursuant to the Denlay Agreement, $10,350,000 was transferred from the Geneve account on April 30, 1998 to Denlay's account, which was controlled by Giffen. (Ind. ¶ 51).

35.     Giffen caused $8 million of these funds to be transferred out of the Denlay account. On May 4, 1998, $5 million was transferred to Nazarbaev's Orel account and $2,500,000 was transferred to Balgimbaev's Orchard Holdings account. On June 29 and July 9, 1998, a total of $500,000 was transferred to an account in the name of NTC International, Inc., a British Virgin Islands company jointly owned by Giffen and Balgimbaev for the purpose of making a private investment in a television station in Kazakhstan. (Ind. ¶ 52).

12

### The Kazakhoil Transaction

36.    Kazakhoil, the state oil company of Kazakhstan, retained an interest in the joint venture described in paragraph 31 above. (Ind. ¶ 48). In or about September 1998, the American oil company Phillips Petroleum Company ("Phillips") purchased from Kazakhoil 50% of its interest in that joint venture. Giffen and Mercator helped arrange and negotiate the transaction. As part of the agreement, on or about September 14, 1998, Phillips Petroleum agreed to pay Kazakhstan, shortly after signing, approximately $271 million. (Ind. ¶ 53).

37.    On or about September 14, 1998, Balgimbaev instructed Phillips to wire $30 million of the $271 million to an escrow account at CAI in Switzerland titled the "Republic of Kazakhstan - Caspian Escrow Account" (the "Caspian Escrow Account"). Acting on those instructions, on or about September 15, 1998, Phillips wired $30 million to the Caspian Escrow Account. (Ind. ¶ 54).

38.    On or about September 12, 1998, CAI had entered into an Exclusive Paying Agency agreement with Kazakhstan controlling disposition of funds within the Caspian Escrow Account. Under the agreement, CAI agreed to distribute the $30 million to specifically identified advisers of Kazakhstan, including Mercator, which received $5 million for its role in the deal. The agreement made it appear that CAI would receive a $22.2 million fee for providing financial advice to Kazakhstan in the transaction. On or about September 25, 1998, $22,219,000 was transferred from the escrow account to the Geneve account, purportedly as CAI's fee. (Ind. ¶ 55).

39.    However, CAI, in a secret sham agreement dated September 25, 1998, agreed to pay 92.349% of any success fee CAI received from the Kazakhoil transaction to Hovelon – a company whose account was secretly controlled by Giffen. This payment purportedly was

13

"compensation" for Hovelon's introducing CAI to the Kazakh government and for "advisory services" supposedly rendered by Hovelon in the transaction (the "Hovelon Agreement"). (Ind. ¶ 56).

40.    On or about September 29, 1998, pursuant to the Hovelon Agreement, CAI transferred $20,519,000 from the Geneve account into the Hovelon account secretly controlled by Giffen. (Ind. ¶ 56).

41.    In truth and in fact, the Hovelon agreement disguised the fact that over 90% of CAI's fee was being paid to Giffen and, through Giffen, to Kazakh officials. (Ind. ¶ 59). In the months to follow, Giffen caused Hovelon to transfer $7,500,000 to Nazarbaev's Orel account (Ind. ¶ 57); $2.58 million to Balgimbaev's Orchard Holdings account (Ind. ¶ 58); and $10.065 million to the Swiss account of a British Virgin Islands corporation named Berkut Holdings, Ltd., secretly owned by Nazarbaev (Ind. ¶ 59).

### The Defendant Funds

42.    In or about July 1999, Giffen and others learned that Swiss authorities had begun an investigation related to the secret Swiss bank accounts beneficially owned by the senior Kazakh officials and others.  Thereafter, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the wire frauds and FCPA violations charged in Counts One through Twenty-Two of the Indictment, Giffen and others transferred and attempted to transfer these proceeds from accounts beneficially owned by Nazarbaev into accounts in Switzerland and elsewhere in the names of Kazakh government agencies.  (Ind. ¶ 88(D)).

43.    On or about August 6, 1999, Nazarbaev directed CAI to transfer $84 million from his Orel account – which included approximately $51.7 million in proceeds of the crimes alleged

14

in Counts One through Twenty-Two of the Indictment, as described in paragraphs 12 through 41 above, plus interest earned thereon – to Account No. ███4025 in the Name of the Treasury of the Ministry of Finance of the Republic of Kazakhstan at Pictet & Cie, Geneva, Switzerland. (Ind. ¶¶ 89(T), 96).

44.     In the transfer of the funds to the account at Pictet in the name of the Republic, the funds described above and the interest earned thereon were commingled with other funds that had been deposited in the Orel account. Those other funds included more than $10 million in other transfers from the Giffen-controlled account in the name of Hovelon, an account into which checks payable to "Bearer" had been deposited; and more than $6 million in other "Bearer" checks deposited into the Orel account.

## IV. CLAIM FOR FORFEITURE

45.     Plaintiff repeats, realleges and incorporates by reference herein, each and every allegation contained in paragraphs one through forty-four of this Verified Complaint.

46.     Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to ... any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C. § 1956(c)(7)]), or a conspiracy to commit such offense," is subject to forfeiture to the United States.

47.     The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because there is probable cause to believe that they constitute or are derived from proceeds traceable to offenses constituting specified unlawful activity, to wit, violations of the FCPA, 15 U.S.C. § 78dd-2, and the wire fraud statute, 18 U.S.C. § 1343; and property traceable to such property.

48.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of ... section 1956 or 1957 of this title [relating to money laundering], or any property traceable to such property," is subject to forfeiture to the United States.

49.    18 U.S.C. § 1956(a)(1), commonly known as the money laundering statute, imposes a criminal penalty upon any person who,

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity–
>
> (A)    (i) with the intent to promote the carrying on of specified unlawful activity; or
>
> (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or
>
> (B)    knowing that the transaction is designed in whole or in part–
>
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
>
> (ii) to avoid a transaction reporting requirement under State or Federal Law.

50.    Section 1956(a) further imposes a criminal penalty upon any person who:

> (2) ... transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States–
>
> (A) with the intent to promote the carrying on of specified unlawful activity; or
>
> (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity

16

and knowing that such transportation, transmission, or transfer is designed in whole or in part–

    (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

    (ii) to avoid a transaction reporting requirement under State or Federal law.

51.    Section 1956(f) provides that:

(f) There is extraterritorial jurisdiction over the conduct prohibited by this section if--

    (1) the conduct is by a United States citizen or, in the case of a non-United States citizen, the conduct occurs in part in the United States; and

    (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

52.    Section 1956(h) provides that:

(h) Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

53.    Section 1957 of Title 18, United States Code, provides, in pertinent part, that "[w]hoever ... knowingly engages or attempts to engage in a monetary transaction [in the United States] in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity" shall be guilty of a crime. A "monetary transaction" includes "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument ... by, through, or to a financial institution ..." 18 U.S.C. § 1957(f)(1).

17

54.     By reason of the foregoing, the Defendant Funds became and are subject to forfeiture to the United States of America, pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant Funds and that all persons having an interest in the Defendant Funds be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant Funds to the United States of America for disposition according to law and that this Court grant plaintiff such further relief as this Court may deem just and proper together with the costs and disbursements in this action.

Dated: New York, New York
       May 3, 2007

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney For Plaintiff the United States of America

By:     _Barbara A Ward_
        BARBARA A. WARD
        Assistant United States Attorney
        One Saint Andrew's Plaza
        New York, New York 10007
        Telephone:  212-637-1048

        Daniel H. Claman
        Senior Trial Attorney
        Asset Forfeiture and Money Laundering Section
        U.S. Department of Justice
        1400 New York Avenue, N.W., Suite 10100
        Washington, DC 20005
        Telephone:  202-514-1263

18

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

   - v -                          :        INDICTMENT

JAMES H. GIFFEN,                   :        S2 03 Cr. 404 (WHP)

                Defendant.    :

- - - - - - - - - - - - - - - - - - - x

<u>COUNT ONE</u>

(Conspiracy to Commit Wire and Mail Fraud And
To Violate The Foreign Corrupt Practices Act)

The Grand Jury charges:

<u>Background</u>

    1.    The Republic of Kazakhstan is located in Central

Asia and borders on Russia, China, Kyrgyzstan, Uzbekistan, and

Turkmenistan.  Formerly a Republic within the Soviet Union,

Kazakhstan has been a sovereign nation since 1991.  Kazakhstan

has substantial deposits of oil and gas within its territory.

Under the Kazakhstan constitution, these natural resources are

Government property.  Since declaring its independence,

Kazakhstan has sold the rights to portions of its oil and gas

wealth to a variety of international oil companies, including

many American oil companies.

    2.    At all times relevant to this Indictment, the

Mercator Corporation ("Mercator"), a corporation headquartered

and incorporated in New York, advised Kazakhstan in connection

with various transactions related to the sale by Kazakhstan of

portions of its oil and gas wealth.  Mercator is a "domestic
concern" as that term is defined in the Foreign Corrupt Practices
Act, 15 U.S.C. § 78dd-2(h)(1)(B).

   3. At all times relevant to this Indictment, JAMES H.
GIFFEN, the defendant, was an American citizen and the principal
shareholder, board chairman, and chief executive officer of
Mercator.  As such, GIFFEN was both an officer, director, and
shareholder of a "domestic concern" and a "domestic concern" in
his own right, as that term is defined in the Foreign Corrupt
Practices Act, 15 U.S.C. § 78dd-2(h)(1)(A,B).  On or about August
1, 1995, GIFFEN was named as a Counselor to the President of
Kazakhstan, a semi-official title that enabled him to influence
and act as an advisor on numerous oil and gas transactions.

   4. On or about December 31, 1994, Mercator entered
into an agreement with the Kazakh Ministry of Oil and Gas
Industries pursuant to which Mercator was tasked with assisting
the Ministry in developing a strategy for foreign investment in
the oil and gas sector and coordinating the negotiation of
numerous oil and gas transactions with foreign partners.  Under
the agreement, Mercator stood to receive "success" fees - that
is, substantial fees paid if and only if the transactions
successfully closed.

   5. Between 1995 and 2000, Mercator was paid
approximately $67,000,000 in success fees for its work for

2

Kazakhstan.  In addition, during the same time period, JAMES H.
GIFFEN, the defendant, caused approximately $70,000,000 paid by
various oil companies into escrow accounts at Banque Indosuez and
its successor, Credit Agricole Indosuez ("CAI") in connection
with the purchase of oil and gas rights in Kazakhstan to be
diverted into secret Swiss bank accounts under his control.  Out
of the success fees paid to Mercator, and the funds diverted by
GIFFEN from the oil transactions into the secret Swiss bank
accounts, GIFFEN directly and through intermediaries made
unlawful payments of more than $84 million to three very senior
officials of the Kazakh Government ("KO-1", "KO-2", and "KO-3").
GIFFEN also spent a portion of the funds diverted from the oil
transactions on luxury items, including millions of dollars in
jewelry.

      6.    KO-1, KO-2 and KO-3 had the power to substantially
influence whether JAMES H. GIFFEN, the defendant, and Mercator
obtained and retained lucrative business as advisors and
counselors to the government of Kazakhstan.  The unlawful
payments GIFFEN made to KO-1, KO-2 and KO-3 ensured that GIFFEN
and Mercator obtained and retained such business, and that they
remained in a position from which they could divert large sums
from oil transactions into accounts for the benefit of senior
Kazakh officials and GIFFEN personally.  The scheme thus
defrauded the Government of Kazakhstan of funds to which it was

3

entitled from oil transactions, and defrauded the people of Kazakhstan of the right to the honest services of their elected and appointed officials.

## Statutory Allegations

7.    From in or about 1995, up to and including in or about 2000, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, violations of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Sections 1341 and 1343.

8.    From in or about 1995, up to and including November 10, 1998, it was a part and an object of the conspiracy that JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, being American citizens and "domestic concerns" as that term is defined in the Foreign Corrupt Practices Act, would and did make use of the mails and any means and instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of anything of value to foreign officials for purposes of (a) influencing acts and decisions of such foreign official in their official

4

capacity, (b) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials, and (c) inducing such foreign officials to use their influence with foreign governments and instrumentalities thereof to affect and influence acts and decisions of such governments and instrumentalities, in order to assist GIFFEN and others known and unknown in obtaining and retaining business for and with, and directing business to, any person, in violation of Title 15, United States Code, Section 78dd-2.

9.    From November 10, 1998 up to and including in or about 2000, it was a further part and an object of the conspiracy that JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, being American citizens and "domestic concerns" as that term is defined in the Foreign Corrupt Practices Act, would and did make use of the mails and any means and instrumentality of interstate commerce and did acts outside the United States corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of anything of value to foreign officials for purposes of (a) influencing acts and decisions of such foreign official in their official capacity, (b) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials, (c) securing an improper advantage, and (d) inducing

5

such foreign officials to use their influence with foreign
governments and instrumentalities thereof to affect and influence
acts and decisions of such governments and instrumentalities, in
order to assist GIFFEN and others known and unknown in obtaining
and retaining business for and with, and directing business to,
any person, in violation of Title 15, United States Code, Section
78dd-2.

10.  It was a further part and an object of the
conspiracy that JAMES H. GIFFEN, and others known and unknown,
having devised and intending to devise a scheme and artifice to
defraud, and for obtaining money and property by means of false
and fraudulent pretenses, representations, and promises, for the
purpose of executing such scheme and artifice and attempting so
to do, unlawfully, willfully and knowingly would and did transmit
and cause to be transmitted by means of wire, radio, and
television communication in interstate and foreign commerce,
writings, signs, signals, pictures and sounds for the purpose of
executing such scheme and artifice, in violation of Title 18,
United States Code, Section 1343.

11.  It was a part and an object of this conspiracy
that JAMES H. GIFFEN, the defendant, and others known and
unknown, having devised and intending to devise a scheme and
artifice to defraud, and for obtaining money and property by
means of false and fraudulent pretenses, representations, and

6

promises, would and did place in a post office and authorized
depository for mail matter, matters and things to be sent and
delivered by the Postal Service, and deposited and caused to be
deposited matters and things to be sent and delivered by private
and commercial interstate carriers, and did take and receive
therefrom matters and things, and did cause to be delivered by
mail and carriers according to the direction thereon, and at the
place at which it was directed to be delivered by the person to
whom it was addressed, matters and things, for the purpose of
executing such scheme and artifice, and attempting to do so, in
violation of Title 18, United State Code, Section 1341.

I.  <u><b>The Tengiz Oil Field Transaction</b></u>

A.    <b>The Transaction</b>

12.   The Tengiz oil field is a large, producing oil
field in Kazakhstan.  Its total reserves have been estimated at
six billion barrels of oil, one billion barrels of natural gas
liquids, and fourteen trillion cubic feet of gas.  In 1994, the
Tengiz oil field was jointly owned by Chevron and the Government
of Kazakhstan.

13.   In or about December 1994, KO-1 retained JAMES H.
GIFFEN, the defendant, and Mercator to assist in, among other
things, the sale of a portion of Kazakhstan's interest in the
Tengiz oil field.  GIFFEN and KO-1 eventually identified Mobil
Oil Corporation ("Mobil") as a potential acquirer of an interest

7

in the Tengiz field, and GIFFEN began negotiations with Mobil.

14.  On or about July 28, 1995, Mobil entered into a preliminary "Heads of Agreement" with the Kazakh Government under which Mobil acquired the right to negotiate with the Kazakh Oil Ministry towards a purchase of a share in the Tengiz field, in exchange for a $5 million "advance" on the eventual purchase price.  In the Heads of Agreement Mobil agreed to negotiate towards the signing of a preliminary "memorandum of understanding" ("MOU") by September 1995, in connection with which Mobil would pay another "advance" of $140 million.  KO-1 signed the Heads of Agreement on behalf of the Kazakh Government.

15.  In a separate side agreement (the "Letter Agreement") also signed on July 26, 1995 by KO-1, Mobil agreed to pay to Mercator, on behalf of Kazakhstan, Mercator's fee for consulting services to Kazakhstan.  The Letter Agreement set those fees at 5% of the eventual purchase price, with $5 million due upon the execution of the Heads of Agreement, $5 million due upon the execution of the MOU, and the balance due at the closing of the Tengiz deal.  On or about August 3, 1995, Mobil wired $5 million to Mercator's account at Citibank in New York, New York.

16.  On or about October 6, 1995, Mobil and the Kazakh Government entered into the MOU.  Under the MOU, the Kazakh Government offered to sell an unspecified portion of the Tengiz field to Mobil for an unspecified price, and Mobil and the Kazakh

8

Government agreed to negotiate the details, with a deadline of
July 28, 1996 to complete the negotiations.  Pursuant to the
Letter Agreement, on or about October 20, 1995, Mobil wired $5
million to Mercator's account at Citibank in New York.

      17.  On or about May 3, 1996, Mobil closed its purchase
of a 25% interest in the Tengiz oil field for approximately $1.05
billion.  Although under the Letter Agreement Mercator's fee was
to have been included within the agreed upon purchase price, at
the request of the Republic, Mobil ultimately agreed to make its
payments to Mercator in addition to the agreed upon purchase
price of $1.05 billion.  Accordingly, Mobil on May 17, 1996,
wired the balance of Mercator's fee, $41 million, to Mercator's
account at Citibank in New York, New York.

### B.    Payments To Kazakh Officials

      18.  In connection with the Tengiz transaction, JAMES
H. GIFFEN, the defendant, and others known and unknown to the
Grand Jury, caused at least $22 million to be secretly paid to
Swiss bank accounts in the name of offshore companies secretly
controlled by senior Kazakh officials.

      19.  On or about November 6, 1995, JAMES H. GIFFEN, the
defendant, caused Mercator to transfer $5 million Mercator had
received from Mobil in connection with the Tengiz deal to a Swiss
account in the name of Nichem Energy Ltd ("Nichem"), a company
controlled by a co-conspirator not named as a defendant herein
("CC-1").

9

20.   JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury then caused Nichem, on or about November 21, 1995, to transfer $1.8 million from Nichem's account in Switzerland, through a clearing account at Bankers Trust in New York, New York, to an account in Switzerland in the name of Orel Capital Ltd. ("Orel").  Orel is a British Virgin Islands corporation owned by the Semrek Foundation, a foundation organized under the laws of Liechtenstein.  The Semrek Foundation was secretly beneficially owned by KO-2 and his heirs.  Funds from the Orel account were used for various purposes, including to pay more than $45,000 to an exclusive Swiss high school attended by the daughter of KO-2.

21.   On or about November 28, 1995, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury caused Nichem to wire $3.2 million to an account in Switzerland in the name of Hovelon Trading S.A. ("Hovelon"), a British Virgin Islands corporation secretly controlled by GIFFEN through a co-conspirator not named as a defendant herein ("CC-2").

22.   On or about December 5, 1995, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, caused Hovelon to transfer $450,000 to a Swiss bank account in the name of Dundy Trading, Ltd. ("Dundy Trading"), a British Virgin Islands company secretly owned by KO-1.

23.   Upon receipt of the $41 million payment from Mobil in connection with the Tengiz transaction on or about May 17,

10

1996, JAMES H. GIFFEN, the defendant, caused Mercator to wire a total of $20 million to Nichem, in four separate wire transfers between August and November, 1996.

24.    Between August and November 1996, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, also caused Nichem to make four corresponding wire transfers, again totaling $20 million, to GIFFEN's secret Hovelon account in Switzerland.

25.    On February 6, 1997, JAMES H. GIFFEN, the defendant, caused Hovelon to wire $20.5 million to KO-2's Orel account.

## II.    **The Karachaganak Processing Transaction**

### A.    **The Transaction**

26.    In an effort to induce Kazakhstan to close the Tengiz deal, Mobil agreed to help Kazakhstan address difficulties it was having in profitably selling gas condensate from the Karachaganak oil and gas field.  On or about July 28, 1995, the date the Tengiz Heads of Agreement and Letter Agreement were executed, Mobil entered into an agreement to finance CC-1 in his purchase, transport, processing, and sale of natural gas condensate from the Karachaganak field.  The deal was structured such that Mobil made unsecured loans to Vaeko Europe Ltd. ("Vaeko"), an assetless shell company controlled by CC-1, which, on paper, was supposed to use the money to purchase Karachaganak gas condensate, transport the condensate to Russia, arrange for

11

its processing there, and then sell the resulting product.  Vaeko was obligated to repay Mobil each month its principal, interest, and a small fixed fee out of the proceeds of the sale of the gas, but was entitled to keep any profits above that fee.  Mobil thus bore all of the financial risk from the unsecured loan to Vaeko, but Vaeko was entitled to all potential profit above the set fee from the sale of the gas condensate.

27.  Between September 1995 and January 1997, Mobil advanced Vaeko more than $78 million, purportedly pursuant to the agreement described above.  Vaeko, however, failed to repay a significant portion of the advances during that time period.  Vaeko ultimately defaulted on more than $30 million of the funds borrowed from Mobil.

### B.    Payments To Kazakh Officials

28.  On or about March 8, 1996, Mobil transferred $6.356 million to Vaeko.  On or about March 13, 1996 Vaeko transferred $1.1 million to Hovelon's Swiss bank account.

29.  JAMES H. GIFFEN, the defendant, thereafter caused Hovelon to transfer $1 million of the funds received from Vaeko to Orchard Holdings, a Bahamas company secretly owned by KO-1.  KO-1 used funds from the Orchard Holdings account for various personal expenses, including to purchase more than $180,000 worth of diamond jewelry and to make a downpayment of more than $20,000 to reserve a week's stay at an exclusive Swiss spa for KO-1 and

12

his family.

### III. The Caspian Pipeline Transaction

#### A.    The Transaction

30.   In or about early 1997, the American oil company Amoco negotiated to acquire from the Kazakh Government an interest in the Caspian Pipeline Consortium ("CPC"), an entity building a substantial pipeline to facilitate international distribution of oil from Kazakhstan.

31.   In March 1997, Amoco entered into an escrow agreement with the Swiss branch of a French bank, Banque Indosuez, and the Kazakh Government.   The escrow agreement required Amoco to pay into an escrow account at Banque Indosuez more than $50 million, to be disbursed purportedly to pay signature bonuses and consulting fees if the transaction closed. The escrow agreement specified that if the transaction closed, $50 million of the funds deposited into escrow would be paid to an entity named TMG-CPC and that approximately $1.8 million would be paid to Mercator for its role in arranging the transaction. TMG-CPC was the legal entity through which the Kazakh government owned its interest in the CPC.   KO-1, in his official capacity, controlled TMG-CPC.

32.   On or about March 19, 1997, Amoco transferred more than $51 million from an account at Chase Manhattan Bank in New York, New York into the escrow account at Banque Indosuez.

33.   On or about May 16, 1997, Amoco advised Banque Indosuez that

13

the transaction had closed and that the funds from the escrow account should be disbursed.  Banque Indosuez thereafter transferred approximately $50 million to TMG-CPC and approximately $1.8 million to Mercator.

### B. Payments To Kazakh Officials

34.  TMG-CPC had, in or about March 1997, entered into a purported "call option" agreement with SOGEA, a Swiss corporation affiliated with Banque Indosuez.  Under this sham agreement, SOGEA purportedly acquired for $500,000 an option to purchase for $5 million the right to receive a bonus equal to 71% of whatever TMG-CPC received from Amoco in the CPC transaction.

35.  Although not disclosed in the call option agreement, SOGEA in entering into that agreement was secretly acting on behalf of Tulerfield Investments, Inc. ("Tulerfield"), a British Virgin Islands company beneficially owned by KO-1 personally.  SOGEA secretly agreed to turn over to Tulerfield any bonus received from TMG-CPC under the call option agreement, less a $1 million fee for its services.

36.  On or about May 21, 1997, SOGEA purchased and exercised the call option, paying TMG-CPC a total of $5.5 million.  TMG-CPC simultaneously transferred to SOGEA $35.5 million.  SOGEA retained its $1 million fee and transferred the remaining funds - $34.5 million -- to Tulerfield.  Tulerfield transferred back $5.5 million to SOGEA to fund the purchase and exercise of the call option, resulting in a net deposit of $29

14

million to KO-1's Tulerfield account.

37.  On or about May 22, 1997, Tulerfield transferred the entire net amount it had received - $29 million - to the Swiss bank account of Hovelon, secretly controlled by JAMES H. GIFFEN, the defendant.

38.  On or about June 24, 1997, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, caused Hovelon to transfer $12 million to KO-2's Orel account.

39.  On or about August 15, 1997, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Hovelon to tranver $6 million to an account in the name of a PIO V Ltd., a British Virgin Islands company secretly owned by a Liechtenstein foundation for the benefit of KO-3 and his family.

40.  On or about August 19, 1997, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Hovelon to transfer $3 million to KO-1's Orchard Holdings account.

41.  On or about September 3, 1997, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Hovelon to transfer $5 million to Brisa, Inc., a British Virgin Islands company owned by the daughter of KO-1.  Funds from that account were used to pay the bills for a credit card in the name of KO-1's daughter.

15

### IV.   The Karachaganak PSA Transaction

#### A.   The Transaction

42.   In or about November 1997, a group of international oil companies, including one American oil company, Texaco, entered into a Production Sharing Agreement ("PSA") with Kazakhstan in connection with the Karachaganak oil and gas field. Under the agreement, the companies acquired certain rights to the oil and gas at Karachaganak. As part of the transaction, the oil companies agreed to pay $17 million into an escrow account in Switzerland at CAI, purportedly for the purpose of paying the fees of certain advisers for Kazakhstan in connection with the transaction.

43.   On or about November 11, 1997, the Kazakh government entered into an "Exclusive Paying Agency" agreement with CAI. Under the Exclusive Paying Agency agreement, CAI agreed to accept the $17 million payment from the oil companies and to distribute it to specifically identified advisers of Kazakhstan, including Mercator, which received $4.75 million for its role in the deal. The Exclusive Paying Agency agreement made it appear that CAI would receive an $11.44 million fee for providing financial advice to Kazakhstan in the transaction.

44.   On or about January 26, 1998, the oil companies, including Texaco, transferred $17 million to CAI. CAI distributed the $17 million as specified in the Exclusive Paying Agency agreement, and, among other things, on or about January

16

30, 1998, transferred $11.44 million to an account at CAI in the name "Clients Divers Geneve" (the "Geneve account"), purportedly as CAI's fee.

### B. Payments To Kazakh Officials

45.  CAI entered into a secret, sham agreement, dated November 18, 1997, with Denlay Associates, Ltd., a British Virgin Islands Company secretly owned by JAMES H. GIFFEN, the defendant (the "Denlay Agreement").  Under the Denlay Agreement, CAI agreed to pay to Denlay "finders & consulting fees" totaling $20,290,000, to the extent CAI received success fees from the Karachaganak PSA transaction, or from a second transaction related to offshore exploration in the Kazakh sector of the Caspian Sea.

46.  Accordingly, upon receiving the $11.44 million, CAI on February 2, 1998 transferred $9.94 million from the Geneve account to Denlay's account.  JAMES H. GIFFEN, the defendant, had caused the account to be opened on or about November 18, 1997, with CC-2 as the signatory, and the account had a zero balance prior to the $9.94 million transfer on February 2, 1998.

47.  On or about February 5, 1998, JAMES H. GIFFEN, the defendant, caused $5 million to be transferred from the Denlay account to KO-2's Orel account.  On or about February 5, 1998, JAMES H. GIFFEN, the defendant, caused $2.5 million to be transferred to KO-1's Orchard Holdings account.  On or about February 9, 1998, GIFFEN caused Denlay to transfer $2.011 million

17

to Condor Capital Management ("Condor"), a British Virgin Islands company owned by GIFFEN. Thus, the secret Denlay Agreement disguised the fact that almost 90% of CAI's purported fee was being paid to GIFFEN and, through GIFFEN, to Kazakh officials and GIFFEN himself.

### V.    The OKIOC Transaction

#### A.    The Transaction

48.    In 1997 and 1998, a consortium of oil companies (the "Caspian Offshore Consortium"), including Mobil, negotiated to acquire from the Kazakh government the rights to participate in a joint venture known as the "Offshore Kazakhstan International Operating Company" ("OKIOC") to explore for oil in certain offshore blocks in the Kazakh sector of the Caspian Sea. JAMES H. GIFFEN, the defendant, and Mercator were hired by the Kazakh government to assist in the negotiations.

49.    On or about November 18, 1997, the oil companies and Kazakhstan entered into a "Production Sharing Agreement" governing their participation in OKIOC's exploration. Under the agreement, the oil companies agreed to pay the Kazakh government a $175 million "signature bonus" due shortly after the signing of the agreement. KO-1 specified that the bonus should be divided amongst three bank accounts: $100 million to an account at Credit Suisse in Switzerland, $52 million to an account at Pictet & Cie, in Switzerland, and $23 million to an account at CAI in Switzerland (the "CAI escrow account").

18

50. On or about November 1, 1997, Kazakhstan and CAI entered into an "Exclusive Paying Agency Agreement" to govern the CAI escrow account. The agreement specified that in exchange for a small fee, CAI would distribute the funds in the CAI escrow account to various consultants who had assisted Kazakhstan in the OKIOC transaction, including Mercator, which received $5.25 million, and CAI itself, which was purportedly to receive $11.85 million for providing financial and analytical services to Kazakhstan.

## B. Payments To Kazakh Officials

51. Between on or about April 24 and 28, 1998, the oil companies participating in the consortium, including Mobil, caused a total of approximately $23 million to be wire transferred to the CAI escrow account. On or about April 28, 1998, $11,850,000 was transferred from the CAI escrow account to the Geneve account, purportedly as payment of CAI's fee. On April 30, 1998, however, pursuant to the sham Denlay agreement described in paragraph 43 above, $10,350,000 was transferred from the Geneve account to the account of Denlay, controlled by JAMES H. GIFFEN, the defendant.

52. On May 4, 1998, JAMES H. GIFFEN, the defendant caused Denlay to transfer $5 million to KO-2's Orel account and $2,500,000 to KO-1's Orchard Holdings account. On June 29, 1998 and July 9, 1998, GIFFEN caused Denlay to transfer a total of $500,000 to an account in the name of NTC International, Inc.

19

("NTC"), a British Virgin Island's company jointly owned by
GIFFEN and KO-1 for the purpose of making a private investment in
a television station in Kazakhstan.  Accordingly, as with the
Karachaganak PSA Transaction, the Denlay Agreement disguised the
fact that almost 90% of CAI's purported fee was being paid to
GIFFEN and, through GIFFEN, to Kazakh officials and GIFFEN
himself.

### VI.    The Kazakhoil Transaction

#### A.    The Transaction

        53.  Kazakhoil, the state oil company of Kazakhstan,
retained an interest in the joint venture described in paragraph
41 above.  In or about September 1998, the American oil company
Phillips Petroleum Company ("Phillips Petroleum") purchased from
Kazakhoil fifty percent of its interest in that joint venture.
JAMES H. GIFFEN, the defendant, and Mercator helped arrange and
negotiate the transaction.  As part of the agreement, on or about
September 14, 1998, Phillips Petroleum agreed to pay shortly
after signing approximately $271 million to Kazakhstan.

20

**B.    Payments To Kazakh Officials**

54.  On or about September 14, 1998, KO-1 instructed
Phillips Petroleum to wire $30 million of the $271 million
payable to the Republic of Kazakhstan to an escrow account at CAI
in Switzerland titled the "Republic of Kazakhstan - Caspian
Escrow Account" (the "Caspian Escrow Account").  Acting on those
instructions, on or about September 15, 1998, Phillips Petroleum
wired $30 million to the Caspian Escrow Account.

55.  On or about September 12, 1998, CAI had entered
into an Exclusive Paying Agency agreement with Kazakhstan
controlling disposition of funds within the Caspian Escrow
Account. Under the Exclusive Paying Agency agreement, CAI agreed
to distribute the $30 million to specifically identified advisers
of Kazakhstan, including Mercator, which received $5 million for
its role in the deal.  The Exclusive Paying Agency agreement made
it appear that CAI would receive a $22.2 million fee for
providing financial advice to Kazakhstan in the transaction.  On
or about September 25, 1998, $22,219,000 was transferred from the
escrow account to the Geneve account, purportedly as CAI's fee.

56.  However, CAI, in a secret sham agreement dated
September 25, 1998, agreed to pay Hovelon 92.349% of any success
fee CAI received from the Kazakhoil transaction, purportedly as
"compensation" for Hovelon's introducing CAI to the Republic of
Kazakhstan and for "advisory services" supposedly rendered by
Hovelon in the transaction (the "Hovelon agreement").  On or

21

about September 29, 1998, pursuant to the Hovelon agreement, CAI transferred $20,519,000 from the Geneve account into the Hovelon account secretly controlled by JAMES H. GIFFEN, the defendant.

57. On or about January 22, 1999, JAMES H. GIFFEN, the defendant, caused Hovelon to transfer $7,500,000 to KO-2's Orel account.

58. On or about April 21, 1999, JAMES H. GIFFEN, the defendant, caused Hovelon to transfer $2.58 million to KO-1's Orchard Holdings account.

59. On or about July 9, 1999, JAMES H. GIFFEN, the defendant, caused Hovelon to transfer $10.065 million to the Swiss account of a British Virgin Islands corporation named Berkut Holdings, Ltd., secretly owned by KO-2. Thus, the Hovelon agreement disguised the fact that over 90% of CAI's fee was paid to GIFFEN and, through GIFFEN, to Kazakh officials.

22

VII. __Other Payments To Kazakh Officials__

60.   On or about August 31, 1995, Dundy Trading
(controlled by KO-1) entered into a contract to purchase for
$910,000 a house in Newton, Massachusetts (the "Newton House").
Between 1995 and 2000, the Newton House was occupied by the wife
and two children of KO-1, while the children attended college in
the area.  During the time that KO-1's family occupied the Newton
House, there were substantial expenses, including property taxes,
insurance, and general upkeep, that totaled more than $36,000.
At the direction of JAMES H. GIFFEN, the defendant, Mercator paid
more than $36,000 of these expenses.

61.   In November and December 1997, JAMES H. GIFFEN,
the defendant, purchased two fur coats, costing together nearly
$30,000, for the wife and daughter of KO-2.

62.   In or about January 1999, JAMES H. GIFFEN, the
defendant, paid the tuition for a daughter of KO-2 at George
Washington University.

63.   In or about August 1999, JAMES H. GIFFEN, the
defendant, caused Mercator to purchase in the United States and
to ship to Kazakhstan a Donzi speedboat costing more than
$80,000.  GIFFEN provided the boat at KO-1's request as a gift
from KO-1 to KO-2.

64.   In or about November 1999, JAMES H. GIFFEN, the
defendant, caused Mercator to purchase in the United States and
to ship to Kazakhstan two snowmobiles for delivery to KO-2 and

23

his wife.

## Means and Methods Of The Conspiracy

65. Among the means and methods by which JAMES H.
GIFFEN, the defendant, and others known and unknown to the Grand
Jury, carried out the objects of the conspiracy were the
following:

A. KO-1, KO-2, and KO-3 had the authority to hire
JAMES H. GIFFEN, the defendant, and Mercator to consult in
connection with various oil transactions, to pay Mercator
substantial success fees if those transactions closed, and to
decide whether or not those transactions would close.  GIFFEN and
Mercator were therefore dependant upon the goodwill of KO-1, KO-
2, and KO-3 to maintain their positions as Counselor to the
President and consultant to the Ministry of Oil and Gas
Industries.

B. JAMES H. GIFFEN, the defendant, and co-
conspirators known and unknown to the Grand Jury, obtained the
services of a co-conspirator not named as a defendant herein
("CC-3"), who was employed at Banque Indosuez and CAI, to
purchase and open bank accounts for a series of shell companies,
incorporated in the British Virgin Islands and the Bahamas, and
controlled variously by GIFFEN, other co-conspirators, and senior
Kazakh officials, including KO-1, KO-2 and KO-3.

C. To enrich those Kazakh officials at the expense of
the Republic of Kazakhstan as a whole, and to improperly

24

influence those Kazakh officials so as to obtain and retain business for themselves and others, JAMES H. GIFFEN, the defendant, and other co-conspirators known and unknown, used various methods to divert money that would otherwise have gone to Kazakhstan from certain oil transactions into secret accounts, opened primarily at Banque Indosuez and CAI in Switzerland, in the names of British Virgin Islands and Bahamas corporations secretly beneficially owned by individual Kazakh officials including KO-1, KO-2 and KO-3.

   D. In some transactions, JAMES H. GIFFEN, the defendant, CC-1, and other co-conspirators known and unknown, secretly transferred a portion of Mercator's purported fees from the transaction, through a series of secret accounts, into accounts secretly beneficially owned by senior Kazakh officials.

   E. On another occasion, JAMES H. GIFFEN, the defendant, CC-1, and other co-conspirators known and unknown, (a) created an assetless shell company; (b) obtained for that company an unsecured loan from an oil company interested in doing business in Kazakhstan; (c) funneled a portion of the borrowed funds, through a series of secret accounts, into an account beneficially owned by a senior Kazakh official, and (d) then defaulted on a substantial portion of the debt to the oil company.

   F. On yet other occasions, JAMES H. GIFFEN, the defendant, CC-3, and other co-conspirators known and unknown to

25

the Grand Jury, (a) caused oil transactions to be structured such that oil companies acquiring rights to oil properties in Kazakhstan made payments to certain escrow accounts at Banque Indosuez and CAI in Switzerland; (b) created a paper record making it appear that those funds would be used to pay Kazakhstan's consultants on the transaction, and (c) then diverted a large percentage of the funds placed in escrow, through a series of secret Swiss accounts, into secret accounts beneficially owned by senior Kazakh officials and GIFFEN himself.

G.    In addition, JAMES H. GIFFEN, the defendant, purchased luxury items, including fur coats, jewelry, speed boats, and snowmobiles, and provided those items free of charge to senior Kazakh officials.

H.    JAMES H. GIFFEN, the defendant, also paid the personal bills of, or provided cash directly to, senior Kazakh officials.  These payments were sometimes disguised on Mercator's books as loans, but no loan documentation was ever created, and no loan repayments were made until after GIFFEN, Mercator, and Kazakh officials learned of criminal investigations into their conduct.

26

**Overt Acts**

66.  In furtherance of the conspiracy and to effect the illegal objects thereof, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

Tengiz

A. On or about July 14, 1995, JAMES H. GIFFEN, the defendant, met with an executive of Mobil in New York, New York regarding the Tengiz and Karachaganak processing transactions.

B.  On or about July 26, 1995, JAMES H. GIFFEN, the defendant, faxed a draft of the Heads of Agreement and the Letter Agreement from New York, New York to an executive of Mobil.

C.  On or about August 3, 1995, JAMES H. GIFFEN, the defendant, caused Mobil to wire $5 million to Mercator's account at Citibank in New York, New York.

D.  On or about October 20, 1995, JAMES H. GIFFEN, the defendant, caused Mobil to wire $5 million to Mercator's account at Citibank in New York, New York.

E.  On or about November 6, 1995, JAMES H. GIFFEN, the defendant, caused Mercator to wire $5 million from its account at Citibank in New York, New York to the Nichem account in Switzerland.

F.  On or about November 21, 1995, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury,

27

caused $1.8 million to be wire transferred from the Nichem
account in Switzerland to KO-2's Orel account.

G.    On or about November 28, 1995, JAMES H. GIFFEN,
the defendant, and others known and unknown, caused $3.2 million
to be wire transferred from the Nichem account in Switzerland to
the Hovelon account in Switzerland controlled by GIFFEN.

H.    On or about December 5, 1995, JAMES H. GIFFEN, and
others known and unknown to the Grand Jury, caused Hovelon to
wire approximately $450,000 to KO-1's Dundy Trading account in
Switzerland.

I.    On or about May 17, 1996, JAMES H. GIFFEN, the
defendant, caused Mobil to wire $41 million to Mercator's account
at Citibank in New York, New York.

J.    On or about May 22, 1996, JAMES H. GIFFEN, the
defendant, caused Hovelon to wire $100,000 to KO-1's Orchard
Holdings account.

K.    On or about June 17, 1996, JAMES H. GIFFEN, the
defendant, caused Hovelon to wire $900,000 to KO-1's Orchard
Holdings account.

L.    On or about August 26, 1996, JAMES H. GIFFEN, the
defendant caused Mercator to wire $5 million from its Citibank
account in New York, New York to the Nichem account in
Switzerland.

M.    On or about August 29, 1996, JAMES H. GIFFEN, the
defendant, and others known and unknown, caused $5 million to be

28

wire transferred from the Nichem account in Switzerland, through
Bankers Trust in New York, New York, to the Hovelon account in
Switzerland controlled by GIFFEN.

      N.    On or about September 17, 1996, JAMES H. GIFFEN,
the defendant, caused Mercator to wire $5 million from its
Citibank account in New York, New York to the Nichem account in
Switzerland.

      O.    On or about September 20, 1996, JAMES H. GIFFEN,
and other co-conspirators known and unknown, caused $5 million to
be wire transferred from the Nichem account in Switzerland,
through Bankers Trust in New York, New York, to the Hovelon
account in Switzerland controlled by GIFFEN.

      P.    On or about October 22, 1996, JAMES H. GIFFEN, the
defendant, caused Mercator to wire $5 million from its Citibank
account in New York, New York to the Nichem account in
Switzerland.

      Q.    On or about November 5, 1996, JAMES H. GIFFEN, and
others known and unknown, caused $5 million to be wire
transferred from the Nichem account in Switzerland, through
Bankers Trust in New York, New York, to the Hovelon account in
Switzerland controlled by GIFFEN.

      R.    On or about November 19, 1996, JAMES H. GIFFEN,
the defendant, caused Mercator to wire $5 million from its
Citibank account in New York, New York to the Nichem account in
Switzerland.

S.   On or about November 29, 1996, JAMES H. GIFFEN, and others known and unknown, caused $5 million to be wire transferred from the Nichem account in Switzerland, through Bankers Trust in New York, New York, to the Hovelon account in Switzerland controlled by GIFFEN.

T.   On or about February 6, 1997, JAMES H. GIFFEN caused Hovelon to wire transfer $20.5 million to KO-2's Orel account.

CPC

U.   On or about May 22, 1997, KO-1 caused Tulerfield to transfer $29 million to GIFFEN's Hovelon account.

V.   On or about June 24, 1997, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Hovelon to transfer $12 million to KO-2's Orel account.

W.   On or about August 15, 1997, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Hovelon to transfer $6 million to KO-3's Pio V account.

X.   On or about August 19, 1997, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Hovelon to transfer $3 million to KO-1's Orchard Holdings account.

Y.   On or about September 4, 1997, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Hovelon to transfer $5 million to Brisa, Inc., a British Virgin Islands company owned by the daughter of KO-1.

Karachaganak PSA

30

Z.    On or about November 18, 1997, JAMES H. GIFFEN, the defendant, caused an account to be opened at a bank in Switzerland in the name of Denlay Associates Ltd.

AA:   On or about February 5, 1998, JAMES H. GIFFEN, the defendant, caused $5 million to be transferred from the Denlay account to KO-2's Orel account.

BB.   On or about February 5, 1998, JAMES H. GIFFEN, the defendant, caused $2.5 million to be transferred from the Denlay account to KO-1's Orchard Holdings account.

CC.   On or about February 9, 1998, JAMES H. GIFFEN, the defendant, caused Denlay to transfer $2.011 million to GIFFEN's Condor account.

<u>OKIOC</u>

DD.   On or about April 24, 1998, JAMES H. GIFFEN, the defendant, and other co-conspirators known and unknown, caused Mobil to wire approximately $3.8 million from Mobil's account at Citibank to CAI's correspondent account at Bankers Trust in New York, New York, for further credit to an escrow account at CAI in Switzerland.

EE.   On or about May 4, 1998, JAMES H. GIFFEN, the defendant, caused $5 million to be transferred from the Denlay account to KO-2's Orel account.

FF.   On or about May 4, 1998, JAMES H. GIFFEN, the defendant, caused $2.5 million to be transferred from the Denlay account to KO-1's Orchard Holdings account.

31

GG.  On or about June 29, 1998, JAMES H. GIFFEN, the defendant, caused Denlay to transfer approximately $350,000 to GIFFEN and KO-1's NTC account.

HH.  On or about July 9, 1998, JAMES H. GIFFEN, the defendant, caused Denlay to transfer approximately $150,000 to GIFFEN and KO-1's NTC account.

<u>Kazakhoil</u>

II.  On or about September 15, 1998, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Phillips Petroleum to wire $30 million from an account in Oklahoma, through an account at Bankers Trust in New York, New York, to an escrow account at CAI in Switzerland.

JJ.  On or about January 22, 1999, JAMES H. GIFFEN, the defendant, caused $7,500,000 to be transferred from the Hovelon account to KO-2's Orel account.

KK.  On or about April 21, 1999, JAMES H. GIFFEN, the defendant, caused $2.58 million to be transferred from the Hovelon account to KO-1's Orchard Holdings account.

LL.  On or about July 6, 1999, JAMES H. GIFFEN, the defendant, caused $10.065 million to be transferred from the Hovelon account to KO-2's Berkut account.

### Supplemental Allegations

_____  67.  The offense involved more than minimal planning within the meaning of United States Sentencing Guidelines Section 2F1.1(b)(2).

32

68.  JAMES H. GIFFEN, the defendant, was an organizer and leader of the criminal activity, and the activity involved at least five participants and was otherwise extensive, within the meaning of United States Sentencing Guidelines Section 3B1.1(a)

(Title 18, United States Code, Section 371)

## COUNTS TWO to TEN

### Violation of the Foreign Corrupt Practices Act

The Grand Jury further charges:

69.  Paragraphs one through six, twelve through sixty-four, sixty-five (A) - (H), and sixty-eight are repeated and realleged as if set forth in full herein.

70.  On or about the dates set forth below, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, being an American citizen and a "domestic concern" as that term is defined in the Foreign Corrupt Practices Act, made use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of anything of value to foreign officials for purposes of (a) influencing acts and decisions of such foreign official in their official capacity, (b) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials, and (c) inducing such foreign officials to use their

33

influence with foreign governments and instrumentalities thereof to affect and influence acts and decisions of such governments and instrumentalities, in order to assist GIFFEN and others known and unknown in obtaining and retaining business for and with, and directing business to, any person, to wit, GIFFEN participated in making unlawful payments to Kazakh officials KO-1 and KO-2 as described in Count One above, and in furtherance thereof, caused the following wire transfers to be made:

| COUNT | WIRE TRANSFER | DATE |
|-------|---------------|------|
| 2 | $41 million wire transfer from Mobil to Mercator's account at Citibank in New York, New York | May 17, 1996 |
| 3 | $5 million wire transfer from Mercator's account in New York to Nichem's account in Switzerland | August 26, 1996 |
| 4 | $5 million wire transfer from Mercator's account in New York to Nichem's account in Switzerland | September 17, 1996 |
| 5 | $5 million wire transfer from Mercator's account in New York to Nichem's account in Switzerland | October 20, 1996 |
| 6 | $5 million wire transfer from Mercator's account in New York to Nichem's account in Switzerland | November 19, 1996 |
| 7 | $51.4 million wire transfer from Amoco's account at Chase Manhattan Bank in New York, New York to an escrow account at CAI in Switzerland. | March 17, 1997 |
| 8 | $3.4 million wire transfer from Texaco's account at Chase Manhattan Bank in New York, New York to an escrow account at CAI in Switzerland | January 27, 1998 |

| 9 | $3.833 million wire transfer from Mobil's account at Citibank in New York, New York, through CAI's correspondent account at Bankers Trust in New York, New York, to an escrow account at CAI in Switzerland | April 24, 1998 |
| 10 | $30 million wire from Phillips Petroleum's account in Oklahoma, through an account at Bankers Trust in New York, New York, to an escrow account at CAI in Switzerland. | September 15, 1998 |

(Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.)

## COUNTS ELEVEN to FOURTEEN

## Violation of the Foreign Corrupt Practices Act

The Grand Jury further charges:

71.   Paragraphs one through six, twelve through sixty-four, sixty-five (A) - (H), and sixty-eight are repeated and realleged as if set forth in full herein.

72.   On or about the dates set forth below, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, being an American citizen and a "domestic concern" as that term is defined in the Foreign Corrupt Practices Act, made use of the mails and means and instrumentalities of interstate commerce and did acts outside the United States corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, and offer, gift, promise to give, and authorization of the giving of anything of value to foreign officials for purposes of (a) influencing acts

35

and decisions of such foreign official in their official capacity, (b) inducing such foreign officials to do and omit to do acts in violation of the lawful duty of such officials, and (c) securing an improper advantage, and (d) inducing such foreign officials to use their influence with foreign governments and instrumentalities thereof to affect and influence acts and decisions of such governments and instrumentalities, in order to assist GIFFEN and others known and unknown in obtaining and retaining business for and with, and directing business to, any person, to wit, GIFFEN participated in making unlawful payments to Kazakh officials KO-1 and KO-2 as described in Count One above, and in furtherance thereof, caused the wire and bank account transfers set forth below to be made:

| Count | Description | Date |
|-------|-------------|------|
| 11 | $7,500,000 transferred from GIFFEN's Hovelon account to KO-2's Orel account in Switzerland | January 22, 1999 |
| 12 | $2,580,000 transferred from GIFFEN's Hovelon account to KO-1's Orchard Holdings account in Switzerland | April 21, 1999 |
| 13 | $10,065,000 transferred from GIFFEN's Hovelon account to KO-2's Berkut account in Switzerland | July 9, 1999 |
| 14 | $80,400 wired from Mercator's account at Citibank in New York, New York to account of Willow Cove Marina, Inc. in Stony Point, New York for purchase of Donzi speedboat. | August 3, 1999 |

(Title 15, United States Code, Section 78dd-2(a) & (i) and Title 18, United States Code, Section 2.)

36

## COUNTS FIFTEEN TO EIGHTEEN

### (Wire Fraud - Tengiz)

The Grand Jury further charges:

73. Paragraphs one through six, twelve through twenty-five, sixty-five (A)-(D), and sixty-seven through sixty-eight are repeated and realleged as if set forth in full herein.

74. On or about the dates set forth below, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud the Republic of Kazakhstan out of millions of dollars from the sale of an interest in the Tengiz oil field to Mobil, unlawfully, willfully, and knowingly, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, to wit, GIFFEN caused at least $22 million in unlawful payments to be made to Kazakh officials out of Mercator's purported fees from the Tengiz transaction, and in furtherance of that scheme, caused the following wire transfers

37

to be made:

| COUNT | WIRE TRANSFER | DATE |
|-------|---------------|------|
| 15 | $5 million wire transfer from Mercator's account at Citibank in New York, York to Nichem's account in Switzerland | August 26, 1996 |
| 16 | $5 million wire transfer from Mercator's account at Citibank in New York to Nichem's account in Switzerland | September 17, 1996 |
| 17 | $5 million wire transfer from Mercator's account at Citibank in New York to Nichem's account in Switzerland | October 22, 1996 |
| 18 | $5 million wire transfer from Mercator's account at Citibank in New York to Nichem's account in Switzerland | November 19, 1996 |

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT NINETEEN

### (Wire Fraud - Caspian Pipeline Consortium)

The Grand Jury further charges:

75.  Paragraphs one through six, thirty through forty-one, sixty-five (A) through (C) and (F), and sixty-seven through sixty-eight are repeated and realleged as if set forth in full herein.

76.  From in or about 1996, up to and including in or about September 1997, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and

38

property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud the Republic of Kazakhstan out of millions of dollars from its sale to Amoco of an interest in the Caspian Pipeline Consortium, unlawfully, willfully, and knowingly, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, to wit, GIFFEN caused at least $29 million to be diverted from the CPC transaction and, from this diverted money, caused at least $26 million in unlawful payments to be made to Kazakh officials, and in furtherance of that scheme, on or about March 19, 1997, caused approximately $51.4 million to be wire transferred from Amoco's account at Chase Manhattan Bank in New York, New York to an escrow account at CAI in Switzerland.

(Title 18, United States Code, Sections 1343 and 2.)

### COUNT TWENTY

### (Wire Fraud - Karachaganak PSA)

The Grand Jury further charges:

77.   Paragraphs one through six, forty-two through forty-seven, sixty-five (A) through (C) and (F), and sixty-seven through sixty-eight are repeated and realleged as if set forth in full herein.

78.   From in or about 1997, up to and including in or

39

about February 1998, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud the Republic of Kazakhstan out of millions of dollars from its sale of an interest in the Karachaganak oil and gas field to Texaco and other oil companies, unlawfully, willfully, and knowingly, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, to wit, GIFFEN caused at least $9 million to be diverted from the Karachaganak PSA transaction and, from this diverted money, caused at least $7.5 million in unlawful payments to be made to Kazakh officials, and in furtherance of that scheme, on or about January 27, 1998, caused approximately $3.4 million to be wire transferred from Texaco's account at Chase Manhattan Bank in New York, New York to an escrow account at CAI in Switzerland.

      (Title 18, United States Code, Sections 1343 and 2.)

40

**COUNT TWENTY-ONE**

**(Wire Fraud - OKIOC)**

The Grand Jury further charges:

79.   Paragraphs one through six, forty-eight to fifty-two, sixty-five (A) through (C) and (F), and sixty-seven to sixty-eight are repeated and realleged as if set forth in full herein.

80.   From in or about 1997, up to and including in or about May 1998, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud the Republic of Kazakhstan out of million of dollars from its sale to Mobil and others of certain exploration and production rights in the Kazakh sector of the Caspian sea, unlawfully, willfully, and knowingly, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, to wit, GIFFEN caused at least $10 million to be diverted from the OKIOC transaction and, from this diverted money, caused at least $7.5 million in unlawful payments to be made to Kazakh officials, and in furtherance of that scheme, on or about April 24, 1998, caused

41

approximately $3.833 million to be wire transferred from Mobil's account at Citibank in New York, New York to an escrow account at CAI in Switzerland.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT TWENTY-TWO

### (Wire Fraud - Kazakoil)

The Grand Jury further charges:

81.  Paragraphs one through six, fifty-three to fifty-nine, sixty-five (A) through (C) and (F), and sixty-seven to sixty-eight are repeated and realleged as if set forth in full herein.

82.  From in or about 1998, up to and including in or about July 1999, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud the Republic of Kazakhstan out of millions of dollars from its sale to Phillips Petroleum of certain exploration and production rights in the Kazakh sector of the Caspian sea, unlawfully, willfully, and knowingly, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and

42

artifice, to wit, GIFFEN caused at least $20.5 million to be
diverted from the Kazakhoil transaction and, from this diverted
money, caused approximately $20 million in unlawful payments to
be made to Kazakh officials, and in furtherance of that scheme,
on or about September 15, 1998, caused approximately $30 million
to be wire transferred from Phillips Petroleum's account in
Oklahoma, through an account at Bankers Trust in New York, New
York to an escrow account at CAI in Switzerland.

(Title 18, United States Code, Section 1343 and 2.)

## COUNT TWENTY-THREE

### (Money Laundering Conspiracy)

The Grand Jury further charges:

83.   Paragraphs one through six, twelve through fifty-
nine, sixty-five (A) through (H), seventy, seventy-two, seventy-
four, seventy-six, seventy-eight, eighty, and eighty-two are
repeated and realleged as if set forth in full herein.

84.   From in or about 1995, until in or about August
1999, in the Southern District of New York, Switzerland, and
elsewhere, JAMES H. GIFFEN, the defendant, and others known and
unknown, unlawfully, willfully, and kno78wingly did combine,
conspire, confederate, and agree together and with each other to
violate Title 18, United States Code, Sections 1956(a)(1)(B)(i),
1956(a)(2)(A), and 1957.

85.   It was a part and an object of the conspiracy that

43

JAMES H. GIFFEN, the defendant, and others known and unknown, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly, would and did transport, transmit and transfer, and attempt to transport, transmit and transfer, and willfully cause others to transfer, transmit and transfer, and attempt to transport, transmit, and transfer, funds from a place in the United States to a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit, violation of the Foreign Corrupt Practices Act ("FCPA") and wire fraud, in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2(b).

      86.   It was further a part and an object of the conspiracy that JAMES H. GIFFEN, the defendant, and others known and unknown, in an offense involving and affecting interstate commerce, knowing that the property involved in certain financial transactions, to wit, the transfer of money between bank accounts, represented the proceeds of some form of unlawful activity, unlawfully, willfully and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activities, to wit, violations of the FCPA and wire fraud, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, in

44

violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

87. It was a further part and an object of the conspiracy that JAMES H. GIFFEN, the defendant, and others known and unknown, would and did unlawfully, willfully and knowingly engage and attempt to engage in monetary transactions by, through, or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, to wit, violations of the FCPA and wire fraud, in violation of Title 18, United States Code, Section 1957.

### Means and Methods

88. Among the means and methods by which JAMES H. GIFFEN, the defendant, and others known and unknown, would and did carry out the conspiracy were the following:

### Promotion of FCPA Violation and Wire Fraud

A. In order to promote the FCPA violations and wire frauds charged in Counts One through Six and Fifteen through Eighteen above related to the Tengiz transaction, JAMES H. GIFFEN, the defendant, caused Mercator to transfer millions of dollars from its account in the United States to Nichem's account in Switzerland. Through a series of subsequent transfers through secret Swiss bank accounts, GIFFEN and others known and unknown to the Grand Jury thereafter caused the funds to be transferred

45

into accounts for the benefit of KO-1, KO-2 and their families.

B.    In order to promote the FCPA violations and wire frauds charged in Counts One, Seven through Thirteen, and Nineteen through Twenty-Two, related to the CPC, Karachaganak PSA, OKIOC, and Kazakhoil transactions, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, caused various American oil companies, including Mobil Oil, Texaco, Phillips Petroleum, and Amoco, to transfer millions of dollars from inside the United States to special escrow accounts that GIFFEN and other conspirators had caused to be set up at CAI  and Banque Indosuez in Switzerland.

### Concealment of Wire Fraud Proceeds

C.    As charged in Counts One and Nineteen through Twenty-Two above, JAMES H. GIFFEN, the defendant, and others known and unknown, caused a substantial percentage of the funds deposited by oil companies into escrow accounts at Banque Indosuez and CAI in connection with the CPC, Karachaganak PSA, OKIOC and Kazakhoil transactions to be diverted into the Hovelon and Denlay accounts which GIFFEN secretly controlled.  As charged in Counts One and Fifteen through Eighteen above, GIFFEN also caused millions of dollars in his purported fees from the Tengiz transaction to be diverted into the Hovelon account.  Thereafter, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the wire frauds charged in Counts One and Fifteen through Twenty-Two above, JAMES

46

H. GIFFEN, the defendant, caused proceeds from those wire frauds to be transferred from the Hovelon and Denlay accounts into the secret Swiss bank accounts for the benefit of KO-1, KO-2, KO-3 and their families, and to a secret Swiss bank account controlled by GIFFEN personally.

### Concealment of Wire Fraud and FCPA Proceeds

D.    In or about July 1999, JAMES H. GIFFEN, the defendant, and others known and unknown, learned that Swiss authorities had begun an investigation related to the secret Swiss bank accounts beneficially owned by KO-1, KO-2, KO-3 and others.    Thereafter, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the wire frauds and FCPA violations charged in Counts One through Twenty-Two above, JAMES H. GIFFEN, the defendant, and others known and unknown, transferred and attempted to transfer wire fraud and FCPA proceeds from accounts beneficially owned by KO-2 into accounts in Switzerland and elsewhere in the names of Kazakh government agencies.

### Overt Acts

89.    In furtherance of the money laundering conspiracy and to effect the illegal object thereof, JAMES H. GIFFEN, the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

47

**Tengiz**

A.    On or about November 6, 1995, JAMES H. GIFFEN, the defendant, caused Mercator to wire $5 million from its account at Citibank in New York, New York to the Nichem account in Switzerland.

B.    On or about August 26, 1996, JAMES H. GIFFEN, the defendant caused Mercator to wire $5 million from its Citibank account in New York, New York to the Nichem account in Switzerland.

C.    On or about September 17, 1996, JAMES H. GIFFEN, the defendant, caused Mercator to wire $5 million from its Citibank account in New York, New York to the Nichem account in Switzerland.

D.    On or about October 20, 1996, JAMES H. GIFFEN, the defendant, caused Mercator to wire $5 million from its Citibank account in New York, New York to the Nichem account in Switzerland.

E.    On or about November 19, 1996, JAMES H. GIFFEN, the defendant, caused Mercator to wire $5 million from its Citibank account in New York, New York to the Nichem account in Switzerland.

**CPC**

F.    On or about March 17, 1997, JAMES H. GIFFEN, the defendant, and other co-conspirators known and unknown, caused Amoco to wire transfer $50 million from an account at Chase

48

Manhattan Bank in New York, New York to an escrow account at CAI
in Switzerland.

        G.   On or about June 24, 1997, JAMES H. GIFFEN, the
defendant, and others known and unknown, caused Hovelon to
transfer $12 million to KO-2's Orel account.

        H.   On or about August 15, 1997, JAMES H. GIFFEN, the
defendant, and others known and unknown, caused Hovelon to
transfer $6 million to KO-3's PIO V account.

        I.   On or about August 19, 1997, JAMES H. GIFFEN, the
defendant, and others known and unknown, caused Hovelon to  make
two transfers totaling $3 million to KO-1's Orchard Holdings
account.

        J.   On or about September 4, 1997, JAMES H. GIFFEN,
the defendant, and other co-conspirators known and unknown,
caused Hovelon to transfer $5 million to Brisa, Inc.

### Karachaganak PSA

        K.   On or about January 26, 1998, JAMES H. GIFFEN, the
defendant, and other co-conspirators known and unknown, caused
Texaco to wire transfer $3.4 million from its account at Chase
Manhattan Bank in New York, New York to an escrow account at CAI
in Switzerland.

        L.   On or about February 5, 1998, JAMES H. GIFFEN, the
defendant, caused $5 million to be transferred from the Denlay
account to KO-2's Orel account.

49

**OKIOC**

M.    On or about April 24, 1998, JAMES H. GIFFEN, the defendant, and other co-conspirators known and unknown, caused Mobil Oil to wire transfer $3.833 million from its account at Citibank in New York, New York, through CAI's correspondent account at Bankers Trust in New York, New York, to an escrow account at CAI in Switzerland.

N.    On or about May 4, 1998, JAMES H. GIFFEN, the defendant, caused $5 million to be transferred from the Denlay account to KO-2's Orel account.

O.    On or about May 4, 1998, JAMES H. GIFFEN, the defendant, caused $2.5 million to be transferred from the Denlay account to KO-1's Orchard Holdings account.

**Kazakhoil**

P.    On or about September 15, 1998, JAMES H. GIFFEN, the defendant, and others known and unknown, caused Phillips Petroleum to wire transfer $30 million from an account in Oklahoma, through an account at Bankers Trust in New York, New York, to an escrow account at CAI in Switzerland.

Q.    On or about January 22, 1999, JAMES H. GIFFEN, the defendant, caused $7,500,000 to be transferred from the Hovelon account to KO-2's Orel account.

R.    On or about April 21, 1999, JAMES H. GIFFEN, the defendant, caused $2.58 million to be transferred from the Hovelon account to KO-1's Orchard Holdings account.

50

S.   On or about July 9, 1999, JAMES H. GIFFEN, the defendant, caused $10.065 million to be transferred from the Hovelon account to KO-2's Berkut account.

### Response To Investigation

T.___On or about August 6, 1999, KO-2 directed CAI to transfer $84 million from his Orel account (which included approximately $51.7 million in proceeds of the crimes alleged in Counts One through Twenty-Two above, plus interest thereon), to an account at Pictet & Cie in Switzerland in the name of the Treasury of Kazakhstan.

U.   On or about August 26, 1999, JAMES H. GIFFEN, the defendant, directed CAI to transfer the balance of KO-2's Berkut account, approximately $10 million, to an account at CAI in Switzerland in the name of a Kazakh government agency, the Agency for Strategic Planning and Reform of the Republic of Kazakhstan, and to transfer the funds in that agency's account to CAI's London branch.

### Supplemental Allegation

90.   JAMES H. GIFFEN, the defendant, was an organizer and leader of the criminal activity, and the activity involved at least five participants and was otherwise extensive, within the meaning of United States Sentencing Guidelines Section 3B1.1(a)

(Title 18, United States Code, Section 1956(f) & (h)).

51

## COUNTS TWENTY-FOUR to THIRTY-ONE

### (International Money Laundering to Promote Wire Fraud And Violation Of The FCPA)

The Grand Jury further charges:

91. Paragraphs one through six, twelve through fifty-nine, sixty-five (A) through (H), seventy, seventy-two, seventy-four, seventy-six, seventy-eight, eighty, eighty-two, eighty-eight (A) and (B), and ninety are repeated and realleged as if set forth in full herein.

92. On or about the dates set forth below, in the Southern District of New York, Switzerland, and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully and knowingly, transported, transmitted and transferred, attempted to transport, transmit and transfer, and caused others to transport, transmit and transfer, and attempt to transport, transmit, and transfer, funds from a place in the United States to a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit, wire fraud and violating the FCPA, to wit, on or about the dates set forth below, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, caused the wire transfers set forth below to be made in order to promote wire fraud and violations of the FCPA:

52

| Count | Wire Transfer | Date |
|---|---|---|
| 24 | $5 million wire transfer from Mercator's account at Citibank in New York, New York to the Nichem account in Switzerland | August 26, 1996 |
| 25 | $5 million wire transfer from Mercator's account at Citibank in New York, New York to the Nichem account in Switzerland | September 17, 1996 |
| 26 | $5 million wire transfer from Mercator's account at Citibank in New York, New York to the Nichem account in Switzerland | October 20, 1996 |
| 27 | $5 million wire transfer from Mercator's account at Citibank in New York, New York to the Nichem account in Switzerland | November 19, 1996 |
| 28 | $51.4 million wire transfer from Amoco's account at Chase Manhattan Bank in New York, New York to an escrow account at CAI in Switzerland. | March 17, 1997 |
| 29 | $3.4 million wire transfer from Texaco's account at Chase Manhattan Bank in New York, New York to an escrow account at CAI in Switzerland | January 26, 1998 |
| 30 | $3.833 million wire transfer from Mobil Oil's account at Citibank in New York, New York, through CAI's correspondent account at Bankers Trust in New York, New York, to an escrow account at CAI in Switzerland | April 24, 1998 |
| 31 | $30 million wire from Phillips Petroleum's account in Oklahoma, through an account at Bankers Trust in New York, New York, to an escrow account at CAI in Switzerland. | September 15, 1998 |

(Title 18, United States Code, Sections 1956(a)(2)(A) and 2).

53

## COUNTS THIRTY-TWO TO FORTY-NINE

### (Money Laundering To Conceal Proceeds of Wire Fraud)

The Grand Jury Further charges:

93.  Paragraphs one through six, twelve through fifty-nine, sixty-five (A) through (H), seventy-four, seventy-six, seventy-eight, eighty, eighty-two, eighty-eight (C), and ninety are repeated and realleged as if set forth in full herein.

94.  On or about the dates set forth below, in the Southern District of New York, Switzerland, and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, in an offense involving and affecting interstate commerce, knowing that the property involved in certain financial transactions, to wit, the transfer of money between bank accounts, represented the proceeds of some form of unlawful activity, unlawfully, willfully and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activities, to wit, wire fraud, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, to wit, on or about the dates set forth below, JAMES H. GIFFEN, the defendant, and others known and unknown, caused the transfers set forth below:

54

| Count | Transfer | Date |
|-------|----------|------|
| 32 | $20.5 million transfer from Hovelon to Orel | February 6, 1997 |
| 33 | $12 million transfer from Hovelon to Orel | June 24, 1997 |
| 34 | $6 million transfer from Hovelon to Pio V | August 15, 1997 |
| 35 | Two transfers, totaling $3 million, from Hovelon to Orchard Holdings | August 19, 1997 |
| 36 | $5 million transfer from Hovelon to Brisa | September 4, 1997 |
| 37 | $5 million transfer from Denlay to Orel | February 5, 1998 |
| 38 | $2.5 million transfer from Denlay to Orchard Holdings | February 5, 1998 |
| 39 | $2.011 million transfer from Denlay to Condor Capital Management | February 9, 1998 |
| 40 | $5 million transfer from Denlay to Orel | May 4, 1998 |
| 41 | $2.5 million transfer from Denlay to Orchard Holdings | May 4, 1998 |
| 42 | $350,000 transfer from Denlay to NTC International | June 29, 1998 |
| 43 | $150,000 transfer from Denlay to NTC International | July 9, 1998 |
| 44 | $2.5 million transfer from Hovelon to Condor | October 20, 1998 |
| 45 | $1.5 million transfer from Denlay to Condor Capital Management | December 30, 1998 |
| 46 | $7,500,000 million transfer from Hovelon to Orel | January 22, 1999 |
| 47 | $256,000 from Denlay to Condor Capital Management | January 27, 1999 |
| 48 | $2.58 million transfer from Hovelon to Orchard | April 21, 1999 |

55

| 49 | $10.065 million transfer from Hovelon to Berkut | July 9, 1999 |
|----|----|----|

(Title 18, United States Code, Sections
1956(a)(1)(B)(i) & (f) and 2).

### COUNTS FIFTY to FIFTY-ONE

**(Money Laundering To Conceal Proceeds of FCPA and Wire Fraud)**

The Grand Jury Further charges:

95. Paragraphs one through six, twelve through fifty-nine, sixty-five (A) through (H), seventy, seventy-two, seventy-four, seventy-six, seventy-eight, eighty, eighty-two and ninety are repeated and realleged as if set forth in full herein.

96. On or about the dates set forth below, in the Southern District of New York, Switzerland, and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown to the Grand Jury, in an offense involving and affecting interstate commerce, knowing that the property involved in certain financial transactions, to wit, the transfer of money between bank accounts, represented the proceeds of some form of unlawful activity, unlawfully, willfully and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activities, to wit, wire fraud and violations of the FCPA, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of specified unlawful activity, to

56

wit, on or about the dates set forth below, JAMES H. GIFFEN, the

defendant, and others known and unknown, caused and attempted to

cause the transfers set forth below:

| Count | Transfer | Date |
|-------|----------|------|
| 50 | $84 million transfer from Orel to Treasury of Kazakhstan account | August 6, 1999 |
| 51 | Direction to transfer balance of Berkut account to Agency for Strategic Planning of the Republic of Kazakhstan account | August 26, 1999 |

(Title 18, United States Code, Sections
1956(a)(1)(B)(i) & (f) and 2).

### COUNTS FIFTY-TWO TO FIFTY-THREE

#### (Unlawful Monetary Transactions)

The Grand Jury further charges:

97.  Paragraphs one through six, twelve through fifty-

eight, sixty-four (A) through (H), twelve through fifty-nine,

sixty-five (A) through (H), seventy, seventy-two, seventy-four,

seventy-six, seventy-eight, eighty, eighty-two and ninety  are

repeated and realleged as if set forth in full herein.

98.  On or about the dates set forth below, in the

Southern District of New York, Switzerland, and elsewhere,

defendant JAMES H. GIFFEN did unlawfully, willfully and knowingly

engage and attempt to engage in monetary transactions by,

through, or to a financial institution, affecting interstate and

foreign commerce, in criminally derived property of a value

greater than $10,000, such property having been derived from a

57

specified unlawful activity, to wit, violations of the FCPA and wire fraud, to wit, GIFFEN caused the transactions set forth below:

| COUNT | TRANSACTION | DATE |
|-------|-------------|------|
| 52 | $350,000 transfer from NTC International account in Switzerland to an account in Kazakhstan | July 1, 1998 |
| 53 | $150,000 transfer from NTC International account in Switzerland to an account in Kazakhstan | July 9, 1998 |

(Title 18, United States Code, Sections 1957(a) & (d)(2) and 2.)

## COUNTS FIFTY-FOUR TO FIFTY-NINE

### (Unlawful Monetary Transactions)

The Grand Jury further charges:

99.  Paragraphs one through six, twelve through fifty-nine, sixty-five (A) through (H), seventy, seventy-two, seventy-four, seventy-six, seventy-eight, eighty, eighty-two, and ninety are repeated and realleged as if set forth in full herein.

100.    On or about the dates set forth below, in the Southern District of New York, Switzerland, and elsewhere, defendant JAMES H. GIFFEN did unlawfully, willfully, and knowingly engage and attempt to engage in monetary transactions, through, or to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, to wit, wire fraud, to wit, GIFFEN

58

engaged in the transactions set forth below:

| Count | Transaction | Date |
|---|---|---|
| 54 | $132,318 check from Condor to a jewelry store in Geneva | December 15, 1998 |
| 55 | $26,253.60 check from Condor to a jewelry store in Geneva | December 15, 1998 |
| 56 | $32,748.76 check from Condor to a jewelry store in Geneva | December 15, 1998 |
| 57 | $113,253.42 check from Condor to a jewelry store in Geneva | December 28, 1998 |
| 58 | $51,293.08 check from Condor to a jewelry store in Geneva | December 28, 1998 |
| 59 | $159,714.35 check from Condor to a jewelry store in Geneva | December 28, 1998 |

(Title 18, United States Code, Sections 1957(a) & (d)(2) and 2.)

## COUNTS SIXTY to SIXTY-THREE

### (Subscribing to False Tax Returns)

The Grand Jury further charges:

101. On or about the dates set forth below, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, unlawfully, willfully, and knowingly did make and subscribe a U.S. Individual Income Tax Return, Form 1040, for himself for the calendar years set forth below, which returns contained and were verified by the written declaration of GIFFEN that they were made under penalty of perjury, and which returns GIFFEN did not believe to be true and correct as to every material matter, in that (1) GIFFEN stated that he did not have an interest in or a signature or other authority over a financial

59

account in a foreign country, whereas, as GIFFEN then and there well knew and believed, he had interests in and signature and other authority over the foreign bank accounts set forth below at CAI and Banque Indosuez in Switzerland; and (2) that GIFFEN omitted from the returns identified below substantial income, generally received by way of payments from these accounts, including at least the approximate amounts from the Condor account listed below:

| Count | Tax Year | Date Subscribed | Foreign Accounts | Omitted Income |
|-------|----------|-----------------|------------------|----------------|
| 60 | 1996 | March 27, 1997 | Hovelon Condor | |
| 61 | 1997 | March 26, 1998 | NTC Hovelon Condor Denlay | $1,188,422 |
| 62 | 1998 | April 6, 1999 | NTC Hovelon Condor Denlay | $813,552 |
| 63 | 1999 | April 4, 2000 | NTC Hovelon Condor Denlay | $5,415 |

### Supplemental Allegations

102.   JAMES H. GIFFEN, the defendant, failed to report and correctly identify the source of income exceeding $10,000 in 1997 and 1998 from criminal activity, within the meaning of United States Sentencing Guidelines Section 2T1.1(b)(1).

103.   JAMES H. GIFFEN, the defendant, used sophisticated

60

means to impede discovery of the existence or extent of the offense, within the meaning of United States Sentencing Guidelines Section 2T1.1(b)(2).

     (Title 26, United States Code, Section 7206(1)).

## COUNT SIXTY-FOUR

### (Conspiracy To Defraud The United States)

The Grand Jury further charges:

104.  Paragraphs one through six and twelve through sixty-four are repeated and realleged as if set forth in full herein.

105.  In 1995 and 1996, J. Bryan Williams was a senior executive at Mobil Oil Corporation ("Mobil").  Williams, an American citizen, was responsible for among other things Mobil's oil trading operations in Russia and other parts of the former Soviet Union, including Kazakhstan.

106.  Senior Executive One ("SE-1"), also an American citizen, was a senior executive at Mercator Corporation from in or about 1994, up to and including in or about 1999.  SE-1 was responsible for, among other things, assisting JAMES GIFFEN, the defendant, in representing the Republic in oil transactions.

107.  From in or about 1995, up to and including in or about 1999, CC-3 was a banker at Banque Indosuez and its successor, CAI, in Switzerland.

### The Tengiz Kickback

108.  On or about April 5, 1996, negotiations between

61

Mobil and the Kazakh Government over the Tengiz oil field broke down.  On or about April 7, 1996, Mobil's Chairman dispatched J. Bryan Williams to Kazakhstan in an effort to restore the negotiations and bring them to closure.  Two days later, Mobil and the Kazakh Government reached an agreement in principle on the Tengiz deal.

109.  On May 17, 1996, Mobil wired $41 million to Mercator's account at Citibank, in New York, New York, as payment of Mercator's purported fee for the Tengiz transaction.

110.  On or about June 18, 1996, CC-3 sent a fax to Mercator indicating that Banque Indosuez anticipated receiving a $4 million transfer from Mercator, and that the transfer would contain a reference line indicating it was for "advisory services" purportedly provided by Banque Indosuez in connection with various oil transactions in Kazakhstan.

111.  On or about June 20, 1996, JAMES GIFFEN, the defendant, caused Mercator to wire $4 million from its account at Citibank in New York, New York to the Hovelon account at Banque Indosuez.  GIFFEN caused the payment to be directed to the attention of CC-3 and to be described in bank records as a payment to Banque Indosuez for "financial  advisory services" supposedly provided to the Republic of Kazakhstan.  In fact, only approximately $100,000 of the $4,000,000 went to pay the fees of Banque Indosuez.

112.  On or about June 24, 1996, JAMES GIFFEN, the

62

defendant, caused $2 million to be transferred from the Hovelon account to a secret account that CC-3 had established at Banque Indosuez for the benefit of J. Bryan Williams.  The account was in the name of Alqi Holdings Ltd. ("Alqi"), a British Virgin Islands corporation secretly beneficially owned by Williams.

113.  Although the $2 million payment constituted income to J. Bryan Williams, Williams did not report it as income on his tax return in 1996, failed to pay the substantial tax he owed as a result of the $2 million payment, and failed to disclose his control of a foreign bank account on his 1996 tax return.

114.  Although the $2 million payment came from Mercator's funds (transferred through Hovelon), JAMES H. GIFFEN, the defendant, caused the payment not to be reported to the IRS on a form 1099 or otherwise.

### The Offshore Bonus TO SE-1

115.  In or about December 1997, JAMES H. GIFFEN, the defendant, met with SE-1 to discuss the bonus to be paid to SE-1 for his work at Mercator in 1997.  During the meeting, GIFFEN informed SE-1 that he wished to pay SE-1 a total bonus of $800,000, of which $400,000 would be paid to SE-1 at SE-1's account in New York.  GIFFEN urged SE-1 to open an offshore account where he could receive the other $400,000.  GIFFEN then arranged for CC-3 to assist SE-1 in opening an account at CAI in Switzerland in the name of an offshore entity, Lanin Securities,

63

Inc. ("Lamin"), secretly for the benefit of SE-1.

116.    Between February and May, 1998, JAMES H. GIFFEN, the defendant, caused a total of $400,000 to be transferred from his Condor account to SE-1's Lamin account.

117.    Although the complete $800,000 paid to SE-1 was compensation for SE-1's work at Mercator, JAMES H. GIFFEN, the defendant, caused Mercator to report to the IRS only the $400,000 paid to SE-1 in the United States and to fail to report to the IRS the $400,000 in compensation paid to SE-1 that was transferred to SE-1's Lamin account in Switzerland.

### Giffen's Offshore Compensation

118.    With the assistance of CC-3, JAMES H. GIFFEN, the defendant, maintained substantial proceeds of the oil transactions described in paragraphs 12 through 58 above in accounts in the name of Condor, Hovelon, and Denlay.

119.    JAMES H. GIFFEN, the defendant, used the funds in those accounts to pay various personal expenses, including to purchase lavish jewelry for GIFFEN's paramours.

120.    JAMES H. GIFFEN, the defendant, caused Mercator not to report GIFFEN's receipt of these funds to the IRS on a form 1099 or otherwise, and hid his receipt of those funds by, among other things, failing to acknowledge his ownership and control of the Condor, Hovelon and Denlay accounts on his personal income tax returns, failing to file required forms with the United States Department of Treasury disclosing the accounts,

and failing to report the income on his federal income tax returns. GIFFEN also failed to report to the IRS income attributable to interest earned on funds on deposit in the Condor, Denlay, and Hovelon accounts.

### Statutory Allegations

121.  From in or about 1995, up to and including in or about 2000, in the Southern District of New York and elsewhere, JAMES H. GIFFEN, the defendant, and others known and unknown, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together and with each other to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS"), by impeding, impairing, defeating and obstructing the lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of income taxes.

### Means and Methods

122.  Among the means and methods by which JAMES H. GIFFEN, the defendant, and others known and unknown, carried out the objects of the conspiracy were the following:

A.  CC-3 opened bank accounts at Banque Indosuez and its successor, CAI, in the names of various offshore entities, including Condor, Denlay, Hovelon, Alqi, and Lamin.

B.  JAMES H. GIFFEN, the defendant, with the assistance of CC-3, caused secret bonuses to be paid to Williams and SE-1 by causing funds to be secretly transferred to the Alqi

65

and Lamin accounts.

        C.    JAMES H. GIFFEN, the defendant, caused funds to be distributed from the Condor, Denlay and Hovelon accounts to pay GIFFEN's personal expenses.

        D.    JAMES H. GIFFEN, the defendant, caused Mercator to file false tax reporting documents with the IRS which omitted the payments to SE-1 and Williams.

        E.    JAMES H. GIFFEN, the defendant, filed false personal income tax returns which ommited GIFFEN's control of Condor, Denlay and Hovelon, and income he received from those accounts.

### Overt Acts

        123.   In furtherance of the conspiracy and to effect the illegal objects thereof, JAMES H. GIFFEN, the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

        A.    On or about June 18, 1996, CC-3 sent a fax to the Merchant Bank.

        B.    On or about June 20, 1996, JAMES H. GIFFEN, the defendant, caused Mercator to wire $4 million from its Citibank account in New York, New York to the Hovelon account in Switzerland.

        C.    On or about June 24, 1996, JAMES H. GIFFEN, the defendant, caused $2 million to be wired from the Hovelon account in Switzerland to the Alqi account in Switzerland.

66

D.    On or about April 15, 1997, J. Bryan Williams filed a false federal income tax return, omitting the $2 million received in the Alqi account on June 24, 1996.

E. ·  On or about October 28, 1997, JAMES H. GIFFEN, the defendant, caused approximately 246,000 Swiss Francs to be paid from the Condor account to Gubelin, SA, a jeweler in Geneva, Switzerland.

F.    On or about October 28, 1997, JAMES H. GIFFEN, the defendant, caused approximately 369,000 Swiss Francs to be paid from the Condor account to Les Ambassadeurs, SA, a jeweler in Geneva, Switzerland.

G.    In or about December 1997, JAMES H. GIFFEN, the defendant, met with SE-1 in New York, New York.

H.    On or about February 6, 1998, JAMES H. GIFFEN, the defendant, caused $200,000 to be transferred from his Condor account to SE-1's Lamin account.

I.    On or about May 25, 1998, JAMES H. GIFFEN, the defendant, caused $200,000 to be transferred from his Condor account to SE-1's Lamin account.

J.    On or about December 15, 1998, JAMES H. GIFFEN, the defendant, caused $132,318.41 to be paid from the Condor account to Bucherer, a jeweler in Geneva, Switzerland.

K.    On or about December 28, 1998, JAMES H. GIFFEN, the defendant, caused $159,714.35 from the Condor account to be paid to Elie Chatila SA, a jeweler in Geneva, Switzerland.

67

L.    On or about March 17, 1999, JAMES H. GIFFEN, the defendant, caused Mercator to file a false form 1120S with the IRS, omitting the $400,000 offshore bonus paid to SE-1.

### Supplemental Allegations

124.    JAMES H. GIFFEN, the defendant, failed to report and correctly identify the source of income exceeding $10,000 in 1997 and 1998 from criminal activity, within the meaning of United States Sentencing Guidelines Section 2T1.1(b)(1).

125. JAMES H. GIFFEN, the defendant, used sophisticated means to impede discovery of the existence or extent of the offense, within the meaning of United States Sentencing Guidelines Section 2T1.1(b)(2).

126. JAMES H. GIFFEN, the defendant, was an organizer and leader of the criminal activity, and the activity involved at least five participants and was otherwise extensive, within the meaning of United States Sentencing Guidelines Section 3B1.1(a)

(Title 18, United States Code, Section 371)

### COUNT SIXTY-FIVE

### (Obstructing The Enforcement Of The Revenue Laws)

The Grand Jury further charges:

127.    Paragraphs 101 through 120, 122(A) through (E), 123(A) through (N), and 125 are repeated and realleged as if set forth in full herein.

128.    From in or about December 1997, up to and including in or about 1999, in the Southern District of New York

68

and elsewhere, JAMES H. GIFFEN, the defendant, corruptly
obstructed and impeded, and endeavored to obstruct and impede,
the due administration of the internal revenue laws, to wit,
GIFFEN corruptly arranged to pay SE-1 a $400,000 bonus from
GIFFEN's secret Condor account in Switzerland to SE-1's secret
Lamin account in Switzerland, and to cause that payment not to be
reported to the IRS, in order to enable SE-1 to evade taxes on
the bonus payment.

(Title 26, United States Code, Section 7212(a)).

## FORFEITURE ALLEGATIONS

129. As a result of committing one or more of the money
laundering offenses alleged in Counts 23 through 59 of this
Indictment, JAMES H. GIFFEN, the defendant, shall forfeit to the
United States pursuant to 18 U.S.C. § 982 all property, real and
personal, involved in the money laundering offenses and all
property traceable to such property, including but not limited
to:

A.    A sum of money equal to $84.33 million, and
all interest and proceeds traceable thereto,
in that such sum in aggregate is property
which was involved in the money laundering
offenses or is traceable to such property.

B.    The contents of the following accounts:

(1)  Account No. 1244450D in the name of
Berkut Holdings Ltd. at CAI, Geneva,

69

Switzerland;

(2)   Account No. 1221320 in the name of Brisa
      Inc. at CAI, Geneva, Switzerland;

(3)   Account No. 1051073Z in the name of
      Condor Capital Management Ltd. at CAI,
      Geneva, Switzerland;

(4)   Account No. 1225580N in the name of
      Denlay Associates Ltd. at CAI, Geneva,
      Switzerland;

(5)   Account No. 1063954 in the name of Dundy
      Trading Corp. at Banque Bruxelles
      Lambert (Suisse) SA, Geneva,
      Switzerland;

(6)   Account No. 1200035 in the name of
      Hovelon Trading S.A. at CAI, Geneva,
      Switzerland;

(7)   Account No. 431-5003660-65 in the name
      of Mercator Corporation at Chase
      Manhattan, New York, New York;

(8)   Account No. 1220420L in the name of NTC
      International Inc. at CAI Indosuez,
      Geneva, Switzerland;

(9)   Account No. 1200067Z in the name of
      Orchard Holdings Ltd. at CAI Indosuez,
      Geneva, Switzerland;

70

(10) Account No. 1017789E in the name of Orel
Capital Limited at CAI Indosuez, Geneva,
Switzerland;

(11) Account No. 1215300V in the name of
Tulerfield Investment Inc., at CAI
Indosuez, Geneva, Switzerland.

C. $51.7 million on deposit in the Treasury of
the Republic of Kazakhstan, account T-94025,
at Pictet & Cie, Geneva, Switzerland, and all
interest and proceeds traceable thereto.

## SUBSTITUTE ASSETS PROVISION

130. If any of the property described above as being
subject to forfeiture, as a result of any act or omission of the
defendant--

(A) cannot be located upon the exercise of due
diligence;

(B) has been transferred or sold to, or deposited with,
a third party;

(C) has been placed beyond the jurisdiction of the
court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property which
cannot be divided without difficulty; it is the intention of the
United States, pursuant to Title 18, United States Code, Section
982(b), to seek forfeiture of any other property of the defendant

71

up to the value of the forfeitable property, including but not limited to the following:

131.    All right, title, and interest of JAMES H. GIFFEN, the defendant, in all that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 1000 Old White Plains Road, Mamaroneck, New York, 10543.

132.    All right, title, and interest of JAMES H. GIFFEN, the defendant, in all that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 25 Beechtree Drive, Larchmont, New York 10538.

133.    All right, title, and interest of JAMES H. GIFFEN, the defendant, in the Mercator Corporation.

(Title 18, United States Code, Sections 982, 1956 & 1957.)

_Gloria Carmona_
FOREPERSON

_David N. Kelley_
DAVID N. KELLEY
United States Attorney

72

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

- v -

**JAMES GIFFEN,**

Defendant.

## INDICTMENT

S2 03 Cr. 404 (WHP)

18 U.S.C. §§ 371, 1341, 1956, 1957
15 U.S.C. § 78dd-2
26 U.S.C. § 7206, 7212

DAVID N. KELLEY
United States Attorney.

**A TRUE BILL**

*Glory Carmona*
Foreperson.